**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

AIDS HEALTHCARE
FOUNDATION, INC.,

     Plaintiff,

v.                                                    Case No. 4:23cv230-MW/MAF

OKALOOSA AIDS SUPPORT AND
INFORMATIONAL SERVICES, INC.,
a/k/a "OASIS," et al,

     Defendants.

**DEFENDANT OKALOOSA AIDS SUPPORT AND INFORMATIONAL**
**SERVICES, INC.'S RESPONSE TO PLAINTIFF'S EMERGENCY**
**MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to this Court's June 21, 2023, Scheduling Order (ECF No. 19),

Defendant OKALOOSA AIDS SUPPORT AND INFORMATIONAL SERVICES,

INC. ("OASIS"), by and through its undersigned counsel, respectfully opposes

Plaintiff AIDS HEALTHCARE FOUNDATION, INC.'s ("AHF") Emergency

Motion for Preliminary Injunction (ECF No. 8), and responds as follows:

**INTRODUCTION**

This is a contract case—or, more precisely, a subcontract case.  OASIS and

AHF worked together to provide services to people living with Human

Immunodeficiency Virus ("HIV") or Acquired Immunodeficiency Syndrome

("AIDS") in Northwest Florida using funds provided by the State of Florida through

1

a federal grant program. Their relationship and activities were governed by a contract. This contract gave OASIS the right to unilaterally terminate it at OASIS's discretion, on thirty days' written notice to AHF. This, OASIS did.

In this lawsuit, AHF claims OASIS's termination of the contract pursuant to that provision was a breach of the contract, and of the implied covenant of good faith and fair dealing. It claims OASIS has tortiously interfered with its relationships with the clients it agreed to work with OASIS to serve.[1] And it claims OASIS inserted new terms into that contract, not present in the parties' prior contracts, that are either arbitrary or illegal.

AHF now asks this Court to enter a preliminary injunction on an emergency basis forbidding OASIS from doing four things: (1) terminating the already-terminated contract; (2) enforcing provisions of that already-terminated contract; (3) taking necessary steps to ensure that OASIS's clients can continue to receive the care they need without interruption; and (4) contacting those clients and explaining to them how to obtain that continuing care.

This Court should deny AHF's motion. As explained herein, AHF has not shown its claims are substantially likely to succeed on the merits, nor that it will

---

[1]     The contract between OASIS and AHF refers to the individuals being provided with services as "clients." (ECF No. 1-3 at 3.) This filing will follow that convention.

suffer irreparable harm absent an injunction.   Furthermore, the balance of the equities and consideration of the public interest both favor denying the motion.

## STATEMENT OF FACTS

### *The Ryan White Program*

In 1990, Congress enacted a program "to provide emergency assistance to localities that are disproportionately affected by the [HIV] epidemic" and provide financial assistance to the States in order to enable "more effective and cost efficient systems for the delivery of essential services to individuals and families with HIV disease."   Ryan White Comprehensive AIDS Resources Emergency Act of 1990, Pub. L. No. 101-381, § 2, 104 Stat. 576 (1990).   The program is known as the Ryan White Program, taking its name from the act's title.   (ECF No. 8-1 at 2.)

The federal government provides funds to the State of Florida through the Ryan White Program to allow Florida to provide the requisite services to low-income Floridians living with HIV and AIDS.   (*Id.*)   The Florida Department of Health ("DOH") administers these funds and distributes them to providers, who provide services.   (*Id.*)   Since 2020, DOH has contracted with OASIS to provide services in Northwest Florida through the Ryan White Program.   (Ex. G at 3;[2] *see also* ECF No. 1-1 (contract between DOH and OASIS ("Lead Agency Contract")).)   In this role—

---

[2]      For ease of navigation, the page numbers in citations to the exhibits attached to this response refer to the page number of the exhibit, displayed as the PDF page number, and not to any internal pagination within the cited documents.

referred to as a Lead Agency role—OASIS subcontracts with entities like AHF to provide services to clients, oversees the provision of those services, and works to make delivery of services more effective and efficient to clients throughout the region.  (Ex. G at 3–5.)  When OASIS subcontracts in this way, it remains fully responsible for the subcontractor's work in providing Ryan White Part B services, including documentation and reporting requirements.  (ECF No. 1-1 at 7, 16–24.)

The State of Florida's Ryan White Part B Patient Care Program Administrative Guidelines instruct that part of the "essential role" a Lead Agency plays includes the "role[] and responsibilit[y]" of "Developing local service delivery guidelines *with service limits*."  (Ex. C at 6 (emphasis added).)  Pursuant to this mandate, OASIS promulgated its own Area 1 Ryan White Support Services Guidelines ("Area 1 Guidelines") for OASIS and its subcontractors to follow.  (Ex. D.)

*OASIS's Subcontract with AHF*

OASIS began working with AHF to provide services to clients in Northwest Florida in 2020.  (Ex. A ("2020 Contract").)  The 2020 Contract required that AHF "[m]aintain a minimum case load of 60 clients and a maximum of 100 per full-time equivalent (FTE) case manager."  (*Id.* at 25.)

In an April 2020 letter to OASIS Executive Director Kurt Goodman, AHF's Regional Manager, Dawn Averill, objected to the caseload cap as "arbitrary" and

4

"inconsistent with the regulatory intent of the Ryan White program."  (Ex. B at 2.)
Nevertheless, Averill stated, AHF would "execute the contract 'as-is' to ensure the
continuity of services for the patients."  (*Id.*)  Goodman responded by explaining the
reasons for OASIS's decision to impose the cap, including the independent 2017–
18 Comprehensive HIV/AIDS Needs Assessment's recommendation that, although
caseloads of between seventy-five and one hundred clients per case manager were
acceptable, but that "best practice" dictated caseloads of fewer than seventy-five
clients per case manager.  (Ex. B at 3–4.)  Goodman clarified that, as Lead Agency,
OASIS had the discretion to subcontract for services and had the authority to provide
oversight to subcontractors.  (*Id.* at 4.)  Goodman also acknowledged "the strained
relationship that has existed between OASIS and AHF" and invited Averill to talk
with him about it in attempt to ensure open communication and mend fences.  (*Id.*
at 4–5.)

OASIS and AHF renewed the contract in 2021 and again in 2022.  (Ex. G at
6; ECF No. 1-2 ("2022 Contract").)  In January 2021, while the 2020 Contract was
still in force, OASIS also promulgated Area 1 Guidelines that required case
managers to "maintain a caseload of not less than 60 clients and not more than 100
clients."  (Ex. D at 8.)  The 2022 Contract did not explicitly include the caseload
cap, but was otherwise substantially the same as the 2020 Contract.  (*See generally*
ECF No. 1-2.)  It obliged AHF to provide clients with both primary outpatient

5

medical care and case management services. (*Id.* at 2.) In terms of case management, this required AHF to screen potential clients for eligibility, assess their service needs and develop individual care plans for each client, coordinate access to care and continually monitor the effectiveness of the care plan, educate and counsel clients about adherence to treatment, link clients to services, advocate for individual clients when necessary. (ECF No. 8-1 at 3.)

The 2022 Contract required AHF to "maintain an adequate administrative and organizational structure sufficient to complete the deliverables under this contract," which included providing case management services as specified therein. (ECF No. 1-2 at 9, 11.) It also required AHF to maintain a minimum caseload of sixty eligible clients per full-time equivalent case manager. (*Id.* at 7, 9.) And the 2022 Contract permitted either party to terminate it "without cause, with no less than thirty (30) calendar days' notice in writing to the other party." (*Id.* at 1.) The 2022 Contract provided it could be renewed for up to three years "by mutual agreement" in writing "and is subject to the same terms and conditions set forth in the original contract," provided the parties agreed in writing to that renewed contract. (*Id.* at 15.)

In late 2022, during an audit of AHF's documentation and reporting, OASIS discovered that AHF was missing a substantial amount of required documentation, and that at least two of AHF's case managers had caseloads of more than 100 clients. (Ex. G at 6; *see also* Ex. E.) Goodman wrote to AHF in March 2023, reminding

6

them of the caseload limit and noting that two of AHF's Area 1 case managers had more than 120 clients.  (Ex. F at 2.)  Goodman committed to funding an additional case manager position at AHF when funds became available to do so, and informed AHF that, in addition to the Area 1 Guidelines' caseload cap, the next subcontract between OASIS and AHF would also contain that cap.  (*Id.* at 3.)

Averill responded to Goodman roughly two weeks later, stating bluntly that "AHF does not cap services."  (*Id.* at 4.)  Averill also asked for clarification about apparent differences in language between versions of the Area 1 Guidelines.  (*Id.*)  On March 27, 2023, Goodman replied, quoting the caseload limitation language from the Area 1 Guidelines and reaffirming OASIS's position that case managers need a caseload of fewer than one hundred clients to effectively provide the required services.  (*Id.* at 6.)  Goodman detailed some of the difficulties OASIS had experienced with obtaining compliance from AHF, noted that OASIS had not experienced similar issues with any other Area 1 subcontractor, and directed AHF to cease its behavior.  (*Id.* at 7.)

In April 2023, the parties executed in the agreement at issue in this case ("the 2023 Contract").  For the most part, the 2023 Contract has the same terms and imposes the same requirements as the 2022 Contract: it included the same requirement to maintain a staffing level adequate to ensure services were properly delivered (ECF No. 1-3 at 8); it contained the same sixty-case minimum caseload

(*id.* at 6); and it contained the same termination-at-will clause (*id.* at 2). In addition to the minimum caseload, the 2023 Contract set a maximum caseload of one hundred cases per full-time equivalent case manager. (*Id.* at 6.)

In mid-April, Goodman wrote to Averill again, detailing the problems with AHF's refusal to comply with the 2023 Contract's caseload limit, including required documentation that was missing, and providing "final notice" that OASIS would terminate the 2023 Contract if AHF continued not to comply with it. (Ex. F at 8–10.) On April 25, 2023, the Deputy Bureau Chief of AHF's Southern Bureau, Russell Walker, emailed Averill and other AHF staff, as well as Goodman, stating that Walker and Goodman had agreed in the interim that AHF would pay a financial penalty for its caseload in excess of the 2023 Contract's limit and would not reduce its caseload. (*Id.* at 11–12.) Goodman replied the next day, clarifying that he had not agreed to allow AHF to continue to increase its caseload "and simply apply financial consequences." (*Id.*) Goodman repeated his plea for AHF to comply with the 2023 Contract, noted again the delays in services clients were experiencing and the missing paperwork due to AHF's excess caseload, and asked for confirmation that AHF would operate within the applicable limitations. (*Id.*)

In light of the impact on client services of AHF's point-blank refusal to follow the requirements of the 2023 Contract, of the deteriorating relationship with AHF, and of the risk to OASIS's Lead Agency Contract posed by AHF's non-performance,

OASIS provided notice on May 1, 2023, that it was exercising its right to unilaterally terminate the 2023 Contract effective June 1, 2023.  (ECF No. 1-4 at 2.)

These proceedings followed.

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy."  *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983).  It is "not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites."  *Id.* (quoting *Canal Auth. v. Callaway*, 489 F.2d 567 (5th Cir. 1974)).  Namely, the movant must show (1) a substantial likelihood that they will succeed on the merits; (2) that they will suffer an irreparable injury absent the injunction; (3) that the threatened injury to them outweighs the damage the injunction would cause to the non-movant; and (4) that the injunction would not contravene the public interest.  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).  "No one factor, taken individually, is necessarily dispositive," but "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial."  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

AHF cannot carry its burden as to any factor, much less any collection of them.  Its claims are unlikely to succeed on the merits.  AHF also cannot show it will suffer any cognizable harm, nor that any such harm could not be repaired later.  The

balance of the equities indicates not only that an injunction would harm OASIS to a degree not in proportion to any benefit AHF might be entitled to, but would also harm the very same public interest AHF claims it protects—namely, the continuity of care for OASIS's clients and the quality of that care.

At the heart of this case is the fact that AHF agreed to the provisions of the 2023 Contract and, in so doing, bound itself to abide by them.  AHF did this despite apparently objecting to some of those provisions.  But the place to resolve such disagreements is in negotiations prior to formation.  A party cannot demand certain contractual terms and—when it does not get them but nonetheless agrees to the contract anyway—then fail to perform the contract it agreed to, only to then ask a federal court to use an emergency procedure to substitute that party's unilateral preference for the terms it assented to.  That is what AHF asks this Court to do here. This Court should decline the invitation.

## I.     AHF is unlikely to succeed on the merits.

"The requirement that the movant make a showing that there is a substantial likelihood of prevailing on the merits does not mean that the movant must actually succeed on the merits." *Roadway Exp., Inc. v. Donovan*, 603 F. Supp. 249, 250 (N.D. Ga. 1985).  But it does mean showing some likelihood that the movant ultimately will do so. *See Hosp. Res. Pers., Inc. v. United States*, 860 F. Supp. 1554, 1555 n.1 (S.D. Ga. 1994) (explaining that making this showing meant showing a

substantial likelihood of proving the merits of the movant's claim). And that likelihood must also be substantial: that is, it must be of sufficient magnitude that a reasonable person would regard it as a realistic prospect in their own decision-making. *Cf. Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 229 (1938) (defining "substantial evidence" as evidence "a reasonable mind might accept as adequate to support a conclusion" and not "a mere scintilla").

AHF cannot make that showing here. None of its claims show much promise; or, to the extent any do, they are matched by defenses OASIS can assert that show just as much merit. Even in its present undeveloped state, the record before this Court reflects that OASIS complied with the strict letter of the 2023 Contract; that the terms of that contract do not contradict the terms of OASIS's contract with DOH nor violate any state or federal law or regulation; and that OASIS cannot, as a matter of law, have tortiously interfered with client relationships OASIS itself was a party to. No amount of additional discovery or development will change any of those facts, and those facts show AHF cannot prevail.

### A.   *AHF is unlikely to prevail on its breach-of-contract claim.*

AHF claims OASIS breached the 2023 Contract by "(1) introducing new and arbitrary terms to the [2023 Contract] that differ from the terms and conditions set forth in the initial contract; and (2) arbitrarily and capriciously terminating [the 2023 Contract] based on these new and arbitrary terms, in violation of the [2023

Contract's] clear and explicit terms." The contractual term in question is the 100-client caseload cap. AHF is unlikely to succeed on any aspect of this claim, for several reasons.

### 1.    *The caseload cap was not new.*

AHF contends the caseload cap was a "new" term and further states that "from the inception of the contractual relationship between OASIS and AHF, the only caseload limit imposed has been a minimum caseload of 60 eligible clients." (ECF No. 8 at 8.) The record does not support this contention. The original 2020 Contract included the 100-client caseload cap. (Ex. A at 25.) AHF and OASIS even discussed it at the time. (*See generally* Ex. B.) The 2022 Contract did not include the cap in the main body, but the cap nevertheless applied by virtue of the Area 1 Guidelines OASIS issued pursuant to its authority as Lead Agency. (Ex. D at 7 (Area 1 Guidelines); Ex. C at 6 (giving OASIS the "responsibilit[y]" for "Developing local service delivery guidelines with service limits".) The record before this Court does not support the contention that the cap was a new development in the 2023 Contract.

### 2.    *The caseload cap was not arbitrary or capricious.*

Neither was the cap an arbitrary or capricious invention of OASIS. Rather, it is a practical reflection of OASIS's determination that an ordinary case manager cannot guarantee each client the quality of service required with an individual caseload of more than one hundred clients. (Ex. G at 5; Ex. B at 3–4.) OASIS

reached this conclusion based on a variety of factual inputs, including an independent "Needs Assessment" study.  (*Id.* at 3.)  And this is not an *ex post facto* justification: it has been OASIS's position throughout the three years that the parties have been discussing the issue.  (*Id.*)  In point of fact, AHF itself formerly took the position that clients would benefit from lower caseloads.  (*Id.* at 4.)

AHF attempts to support its contention by arguing that there is no legal requirement to cap each case manager's caseload, and by denying that there is a factual basis to impose the cap.  But a bald denial of evidence is not evidence, and the absence of a legal requirement does not undercut the fact that the cap was an exercise of OASIS's reasoned judgment.  The cap did not "exist[] or com[e] about seemingly at random or by chance," nor was it "based on or determined by individual preference or convenience rather than by the intrinsic nature of" the task of providing effective Ryan White Part B services.  *Arbitrary*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/arbitrary.  Nor was it the product of OASIS's whim or caprice.  It was a reasoned, reasonable step towards effectuating the legislative mandate of the Ryan White program: providing quality, effective, cost-efficient support and services to individuals affected by HIV and AIDS.  *See* 42 U.S.C.A. § 300ff (stating the purpose of the Ryan White program).  The simple fact is, an action is not arbitrary or capricious just because someone disagrees with it.

The evidence before this Court reflects that AHF disagrees—vociferously—with the necessity for the caseload cap; but it also reflects that the cap exists for a reason.

### 3.   *AHF is estopped from denying that it was bound by the caseload cap.*

Even if AHF's arguments about the enforceability of the caseload cap had some merit, AHF would still be unlikely to succeed on this issue because AHF is estopped from denying that it was bound by the caseload cap.  This form of contractual estoppel is based on "the acceptance and retention by one having knowledge or notice of the facts of benefits from a … contract … which he might have rejected or contested" and is "a branch of the rule against assuming inconsistent positions." *Head v. Lane*, 495 So. 2d 821, 824 (Fla. 4th DCA 1986) (quoting *Doyle v. Tutan*, 110 So. 2d 42, 47 (Fla. 3d DCA 1959)).  "Such estoppel operates to prevent the party thus benefited from questioning the validity and effectiveness of the [contract] insofar as it imposes a liability or restriction upon him," and therefore "it precludes one who accepts the benefits from repudiating the accompanying or resulting obligation." *Id.* (quoting same).  "The law is too well settled to admit of controversy that one may not accept the fruits of a contract and at the same time renounce, or repudiate, the burdens which that contract places upon him." *Warren v. Tampa Mortg. Invs. Co.*, 150 So. 738, 741 (Fla. 1933).  "It has been repeatedly held that a person by the acceptance of benefits may be estopped from questioning the validity of a contract … and, having adopted one course with knowledge of the

facts, he cannot afterwards pursue the other." *Hendricks v. Stark*, 126 So. 293, 297 (Fla. 1930).

Whatever AHF's private reservations about the caseload cap were, the fact remains that AHF executed the relevant contracts and accepted their benefits. AHF agreed to the cap in the 2020 Contract. It agreed to it again in the 2023 Contract. And in the 2022 Contract, even though the caseload cap was not spelled out in the contract itself, it was included in the Area 1 Guidelines OASIS promulgated pursuant to its authority under Florida's Ryan White Part B guidelines, which were incorporated by reference into the 2022 Contract. AHF is wrong to contend that the caseload cap was invalid; but under Florida law, AHF is further estopped from denying that it was bound by the caseload cap. *See id.* ("If a man is silent when he ought to speak, equity will debar him from speaking when conscience requires him to keep silent.").

### 4. *The caseload cap is not illegal.*

AHF further argues that the caseload cap is an illegal term of the 2023 Contract. As its basis, AHF cites the Lead Agency Contract's requirement that any subcontracts incorporate the terms of DOH's standard contract, and that DOH must approve any modification, termination, or amendment of a subcontractor agreement. (ECF No. 1-1 at 7, 20.) AHF further contends OASIS "improperly imposed" the "new" caseload cap "on AHF, contrary to the grant of authority from the State to

15

enter such subcontractor agreements." (ECF No. 8 at 8.)  It then says that "[t]o the extent that OASIS exceeded its authority or failed to follow the law, its actions (and the additional contract provisions it introduced) are void and unenforceable." (*Id.*)

But AHF has not shown OASIS "exceeded its authority or failed to follow the law" to any extent whatsoever.  The record reflects that OASIS and AHF *agreed to* the caseload cap, both in 2020 and in 2023, by agreeing to the contracts of those years.  It also reflects that OASIS separately promulgated regulations pursuant to the authority the State of Florida delegated to it as Lead Agency that also included the caseload cap.  Neither of these actions exceeded OASIS's authority.  And AHF provides no evidence that OASIS did not submit its subcontracts to DOH for review or that DOH did not approve them.  On the record before this Court, AHF has not shown it is substantially likely to succeed on the merits here.

AHF claims the 2022 Contract "expressly stated that it may *only* be renewed 'subject to the same terms and conditions set forth in the original contract.' " (ECF No. 8 at 8 (emphasis added).)  Not so.  The provision in question reads:

> Contract Renewal: This contract may be renewed for a period that may not exceed three years beyond the initial contract or for the original term of the contract, whichever is longer, and is subject to the same terms and conditions set forth in the initial contract.  Renewals must be in writing, made by mutual agreement, and will be contingent upon satisfactory fiscal and programmatic performance evaluations as determined by the Department and will be subject to the availability of funds.

(ECF No. 1-2 at 15.)   Notably absent from this provision is the word "only" or "exclusively."   Rather, this provision provides the parties with the option, if they mutually agree to it, to renew the contract as-is for a definite period under certain conditions.   It in no way restricts their discretion to agree to renew it under modified terms, or to enter a new contract with different terms (whether that agreement is titled a "renewed" contract or not).   That is what happened here.   Rather than renew the exact same contract for 2023, AHF and OASIS agreed to a contract with modified terms to take effect after the 2022 Contract terminated.   If a party were forever restricting its freedom of contract in the way AHF suggests, it is more reasonable to expect they would do so explicitly rather than *sub silentio*. Moreover, both the 2022 Contract and the 2023 Contract are subject to the Area 1 Guidelines, which include the caseload cap, so the change in contractual language from 2022 to 2023 is not a substantive one on this point.   Additionally, a provision purporting to restrict the parties' ability to negotiate later contracts would be an unenforceable "agreement to agree."   *See, e.g.*, *ABC Liquors, Inc. v. Centimark Corp.*, 967 So. 2d 1053, 1056 (Fla. 5th DCA 2007) (explaining agreements to make future contracts are unenforceable "agreement[s] to agree" "as a matter of law").

### 5.   *OASIS's termination of the 2023 Contract was not arbitrary, capricious, nor illegal, and was a lawful exercise of OASIS's right to terminate the 2023 Contract at will.*

AHF is also unlikely to prevail on its breach-of-contract claim because, as OASIS explained in its Motion to Dismiss, that claim fails as a matter of law. (ECF No. 20 at 5–10.)  AHF's claim does not allege—and AHF cannot prove—that OASIS's termination of the 2023 Contract was a material breach of that contract. AHF's argument overlooks the 2023 Contract's termination-at-will provision, which allows either party to terminate the 2023 Contract without cause on thirty days' written notice. (ECF No. 1-3 at 2.)

The record before this Court reflects, therefore, that OASIS has done nothing more than exercise its contractual rights in the precise way the 2023 Contract requires it to do.  It is axiomatic that following the terms of an agreement cannot be described as a breach of the agreement.  *See Breach*, Black's Law Dictionary (11th ed. 2019) (defining "breach" as "a violation or infraction of a[n] … agreement"). There is nothing arbitrary or capricious about exercising a contractual right in the exact way the contract contemplates the party may exercise it.  Moreover, the record before this Court reflects that OASIS's decision to exercise its termination-at-will right was not the product of random whimsy, but rather was the result of the continuing resistance and noncompliance OASIS was encountering from AHF, their increasingly unproductive relationship, and the risk AHF's conduct posed both to

OASIS's clients and to OASIS's status as Lead Agency.  (*See generally* Ex. F.)

Legally and factually, AHF is unlikely to succeed on the merits of this claim.

Much of AHF's argument depends on the presumption that the caseload cap

was itself illegal.  As explained above, it was not.  But even if it were, OASIS had a

sufficient, reasonable basis to exercise its termination rights irrespective of the cap.

The record before this Court reflects that AHF was substantially out of compliance

with other provisions of the 2023 Contract, too, and that its noncompliance

threatened OASIS's ability to serve its clients effectively and to retain its Lead

Agency status for Area 1.  AHF was not performing its documentation and reporting

requirements, and in OASIS's view it did not maintain an adequate staff to provide

services as the 2023 Contract required.  This standing alone, without reference to the

caseload cap, would justify a reasonable person in OASIS's position in exercising

their termination-at-will rights.  And even if this also were not so, the increasingly

unproductive and acrimonious relationship between OASIS and AHF would itself

have been a sufficient basis for a reasonable person to take that step.  No view of the

facts supports AHF's contention that OASIS arbitrarily, capriciously, or illegally

terminated the 2023 Contract.  AHF is unlikely to succeed on the merits of this claim.

Furthermore, as OASIS explained in its Motion to Dismiss, Florida law

teaches that "the requirement that one party forego exercising its contractual right to

terminate until after proper notice has been given has been deemed sufficient

consideration to support execution of a termination clause." *Handi-Van, Inc. v. Broward Cnty.*, 116 So. 3d 530, 539 (Fla. 4th DCA 2013). The 2023 Contract's termination-at-will clause is therefore enforceable. It is also noteworthy that the termination-at-will clause was not unilateral: AHF had the same right to terminate the 2023 Contract that OASIS did. OASIS had a legitimate contractual right. OASIS exercised that right legitimately, and did so in the way the contract provided. This was not a breach of the contract.

The case at bar is on all fours with Judge Wetherell's recent decision in *McKinney v. Portico, LLC*, No. 3:22cv9914-TKW/ZCB, 2023 WL 2889737 (N.D. Fla. Mar. 30, 2023). In that case, Portico terminated the relevant contract with seven days' written notice and cited a termination-for-cause provision rather than the termination-for-convenience provision that required seven days' notice. *Id.* at *2– 3. After McKinney sued, Portico moved to dismiss, arguing the breach-of-contract claim must fail because the contract authorized Portico to terminate it without cause upon seven days' notice. *Id.* at *4. Judge Wetherell granted the motion to dismiss, reasoning that Portico had the right to terminate the contract upon the requisite notice regardless of the reason, and that it therefore it did not matter why Portico terminated the contract or what its termination letter contained. *Id.* at *4–5. As in *McKinney*, so here: OASIS had the right to terminate the 2023 Contract at will. AHF had that same right. OASIS chose to exercise it and followed the procedural requirements

for doing so.  To the extent OASIS was required to have a reasonable basis to do this, the record reflects that it had not one, but several.  (*See generally* Ex. F.)  AHF cannot succeed on its breach-of-contract claim.

> **B.**     ***AHF is unlikely to prevail on its implied-covenant claim.***

AHF is also unlikely to prevail on its claim for breach of the implied covenant of good faith and fair dealing ("implied-covenant claim").  As OASIS explained in its motion to dismiss, "[t]he scope of the implied covenant of good faith and fair dealing is necessarily limited by the express language of the contract.  Conduct which is expressly authorized by [the contract], for example, cannot be said to breach the implied covenant."  *Burger King Corp. v. Weaver*, 798 F. Supp. 684, 688 (S.D. Fla. 1992) (citation omitted).  The logic is simple: an action the contract expressly authorizes cannot reasonably undercut "the reasonable expectations of the contracting parties in light of their express agreement."  *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 548 (Fla. 2012); *see also Flagship Resort Dev. Corp. v. Interval Int'l, Inc.*, 28 So. 3d 915, 924 (Fla. 3d DCA 2010) (noting an implied-covenant claim "cannot be used to vary the terms of an express contract").

Here, OASIS did exactly what the 2023 Contract authorized it to do: it terminated the contract at its own will on thirty days' written notice to AHF.  AHF is unlikely to succeed on its implied-covenant claim.

### C.    As a matter of law, AHF cannot prevail on its tortious-interference claim.

AHF is similarly unlikely to succeed on its tortious-interference claim.  As OASIS explained in its Motion to Dismiss, AHF cannot show that OASIS is "a third party" or "a stranger to the business relationship" in question, as it must to prevail on this claim.  *Palm Beach Cnty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009).  Rather, the record reflects that OASIS "has a supervisory interest in how the relationship is conducted" and "a potential financial interest in how [the] contract is performed," and therefore "cannot be held liable for tortious interference."  *Id.*  These clients are OASIS's clients, and these interests are OASIS's own interests under the 2023 Contract and the Lead Agency Contract.  *See id.* ("An interested third-party accused of tortious interference is essentially 'interfering' with its own interests.  This is not interference; it is freedom of contract.").

Second, "conduct engaged in for legitimate purposes, even if tinged with animosity and malice, does not give rise to a cause of action for interference with a contractual relationship."  *Menendez v. Beech Acceptance Corp.*, 521 So. 2d 178, 180 (Fla. 3d DCA 1998).  OASIS's has not done anything illegitimate here: rather, it has invoked an enforceable contractual right on a substantial, reasonable basis, followed the procedure for doing so, and then continued to perform its obligations under the Lead Agency Contract to ensure that its Area 1 clients receive services.

On either basis, therefore, AHF is unlikely to succeed on this claim.

### D.     *AHF also cannot prevail on its claim for declaratory relief.*

AHF is also unlikely to succeed on its claim for declaratory relief.  It seeks a declaration that the caseload limit violated the Lead Agency Contract, was beyond OASIS's authority, and violated the 2022 Contract's renewal terms; that OASIS's termination of the 2023 Contract "based on the [caseload] caps is *ultra vires* and therefore void"; and that the termination violates 45 C.F.R. §§ 75.328(a)(1) & (7) because the caseload cap is arbitrary and capricious.  (ECF No. 1 at 13–14.)  AHF also contends the caseload cap violates Florida's 2020-21 HIV/AIDS Patient Care Program Administrative Guidelines, but does not seek a declaration to that effect. (*Id.* at 12.)

Most of this has already been addressed: OASIS has explained at length herein why the caseload cap was within its authority, was not arbitrary nor capricious, and did not violate the Lead Agency Contract nor the 2022 Contract's renewal terms; and OASIS's exercise of its termination right was not *ultra vires*, arbitrary, unreasonable, or illegal.  All that remains is whether the caseload cap violates the Code of Federal Regulations or Florida's administrative guidelines.

It does not.   The relevant federal Code provisions prohibit "Placing unreasonable requirements on firms in order for them to qualify to do business" and "Any arbitrary action in the procurement process."  In terms of substance, this adds

nothing new to the contentions OASIS has already shown to be meritless: neither the caseload caps nor OASIS's termination of the 2023 Contract were arbitrary nor unreasonable.  The federal Code avails AHF nothing.

Neither does the Florida administrative provision it cites in its Complaint.  The provision AHF cites provides, in pertinent part, that Lead Agency subcontracts "must contain language and restrictions like the primary contract, including scope of work" and "must model the Ryan White Part B … lead agency contract."  (ECF No. 1 at 12.)  It does not say subcontracts must be identical to the Lead Agency contract, slavishly imitate it, only vary from it with express written permission, or anything else of the kind.  The 2023 Contract is "like the primary contract" in its language and restrictions, and it does "model the … lead agency contract."  The best evidence of this is that DOH approved the 2020 Contract, which contains the caseload cap AHF contends is unlike the Lead Agency contract and does not adequately model that contract.  If it was good enough for DOH, there is no reason it should not be good enough for this Court.

A second problem concerns AHF's source.  The 2020-2021 Patient Care Program Administrative Guidelines AHF quotes here is the same source that assigns OASIS the responsibility to "Develop[] local service delivery guidelines with service limits."  (Ex. C at 6.)  The requirement that subcontracts contain restrictions like those in the lead agency contract and model the lead agency contract appears on

page 9 of that document (*id.* at 11); the provision giving OASIS the authority to develop local standards and restrictions supplemental to the Lead Agency contract appears on page 4 (*id.* at 6).  AHF is unlikely to prevail on this claim.

### E.     On its own terms, the injunction AHF seeks is moot.

In addition to the problems AHF's claims face on the merits, the specific preliminary injunction it seeks is also problematic.  Specifically, AHF asks this Court to forbid OASIS from terminating the 2023 Contract and from enforcing the caseload caps.  (ECF No. 8 at 14.)  But OASIS already terminated the 2023 Contract. By the time AHF filed the instant motion, the 2023 Contract had been terminated for almost two weeks, and AHF had known it was going to be terminated for a full month before that.

This creates a problem for AHF: the thing AHF asks this Court to prevent has not only already occurred, it occurred weeks before AHF asked this Court to forbid it from happening.  Its request is therefore moot.  *See Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs, Ga.*, 868 F.3d 1248, 1264 (11th Cir. 2017), abrogated on other grounds, (explaining a case "is moot when the requested relief, if granted, would no longer have any practical effect").  Had AHF sought a preliminary injunction reinstating the terminated contract, or sought a preliminary injunction before the contract termination became effective, this mootness concern would not arise.  *See Austin v. Univ. of Fla. Bd. of Trs.*, 580 F. Supp. 3d 1137, 1174 (N.D. Fla.

2022) (Walker, C.J.) (explaining that preliminary injunctions focus on preventing irreparable harm, not on formalistic maintenance of the status quo).  But AHF has done neither of those things, and the relief it does seek is beyond this Court's power to provide.  By asking this Court to forbid OASIS from terminating the 2023 Contract, AHF in effect asks this Court not to stop the Sun from rising tomorrow, but to retroactively order the Sun not to rise *yesterday*.

A similar problem arises with AHF's request for this Court to order OASIS not to enforce the caseload caps.  Leaving aside the substantive problems with that request, the fact remains that, with the 2023 Contract having already been terminated, there is nothing to enforce (nor prevent enforcement of).  An injunction preventing OASIS from enforcing a provision of a terminated contract that lacks any continuing force or effect would itself have no practical effect.  Again, this mootness concern would not have arisen had AHF either sought a preliminary injunction before the 2023 Contract's termination became effective, or had AHF asked this Court to order reinstatement of the 2023 Contract, but AHF has not sought those things.

Therefore, to the extent AHF seeks a preliminary injunction to prevent OASIS from terminating the contract and enforcing the caseload caps within that terminated contract, this Court should deny the motion as moot.

26

## II.     AHF cannot show it will suffer any cognizable harm, nor that any such harm could not be remedied later.

If a party cannot show they will suffer irreparable harm absent an injunction, such an inability alone is sufficient to deny the injunction.  *See Jefferson Cnty.*, 720 F.2d at 1519 (reasoning that, because the movants had not shown irreparable harm, it was unnecessary to discuss any of the other prerequisites).  This is such a case.

First, to the extent AHF claims OASIS's clients will suffer irreparable harm if they are unable to seek services from AHF, AHF lacks standing to assert this. Even were it true that some OASIS clients would be unable to access Ryan White Part B services from other sources, that harm would befall the OASIS clients in question, not AHF.  AHF has no more standing to assert this supposed harm than a business does to assert a supposed harm to its customers.  *See E.F. Hutton & Co., Inc. v. Hadley*, 901 F.2d 979, 985 (11th Cir. 1990) (explaining that a party lacks standing where their claim is "an assertion of a third party's rights" or does not assert "an injury particular to the litigant").   And, because AHF is not a voluntary association and OASIS's clients are not "members" of AHF, AHF does not have associational standing to assert these harms, either.  *Cf. Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (setting forth the requirements for associational standing).  It is proper for this Court to consider potential harm to OASIS's clients as a facet of the public interest—a consideration which favors

OASIS in this case, as explained below—but not when determining whether AHF will suffer irreparable harm absent an injunction.

This leaves the only other alleged harms AHF can articulate: the fact that, following the termination of the 2023 Contract, it is no longer receiving Ryan White Part B funds from OASIS, and the allegation that OASIS has tortiously interfered with what AHF contends are its business relationships with OASIS's clients. Neither of these alleged harms is irreparable.  If merited, they could both be remedied by awards of damages: standard contract damages in the former case, and standard tort damages in the latter.  *See, e.g.*, *Hobbley v. Sears, Roebuck & Co.*, 450 So. 2d 332, 333 (Fla. 1st DCA 1984) (explaining the purpose of compensatory damages in breach-of-contract actions); *Ins. Field Servs., Inc. v. White & White Inspection & Audit Serv., Inc.*, 384 So. 2d 303, 308 (Fla. 5th DCA 1980) (affirming an award of compensatory damages for a claim of tortious interference).  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see also* ECF No. 1 at 8 (seeking both a permanent injunction and compensatory damages for alleged breach of contract).  To the extent AHF can articulate some showing of harm here, that harm would not be irreparable.  This failure is a sufficient basis, standing alone, to deny the instant motion.

### III.    The balance of the equities favors OASIS.

This Court must next analyze whether AHF has "pro[ven] that the threatened injury to [AHF] will outweigh any harm that might result to [OASIS]" if the injunction is granted.  *N.E. Fla. Chapter of Ass'n of Gen. Cont'rs of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990).  AHF has not proven this, either.

The record before this Court reflects that, over the course of their interactions over the past three years and beyond, relations between OASIS and AHF have been consistently contentious and communication has become difficult.  (*See generally* Ex. B.)  This litigation is proof positive that the parties have substantial differences impacting their day-to-day dealings that span multiple years and that they have been unable to resolve.  OASIS's position is that AHF must follow certain requirements, while AHF's position is that it need not follow them.  Granting any injunction that forces OASIS back into what it regards as an unworkable relationship with AHF— a relationship which had become so dysfunctional that the most prudent step was to throw in the towel and terminate it—would work substantial harm to OASIS's ability to carry on its ordinary operations as it sees fit, and also to its exercise of its rights under the 2023 Contract.

It would also jeopardize OASIS's ability to perform its obligations as Lead Agency for Area 1, potentially causing DOH to cancel the Lead Agency Contract because, under that contract, OASIS would be ultimately responsible for AHF's

noncompliance.  (ECF No. 1-1 at 7.)  The record reflects that, despite OASIS's best efforts, it has been unable to obtain AHF's compliance or at least an assurance that it will comply in the future: instead, AHF has continued to increase its caseload and to commit to increasing it still further, ensuring that the problem of noncompliance with documentation and reporting requirements will continue.  (Ex. F at 11.)  An injunction that forces OASIS and AHF to drink again from the poisoned well of their former contractual relationship would wreak substantial harm on OASIS that easily outweighs any supposed harm AHF will suffer from being unable to provide Ryan White Part B services in Area 1.

The same is true for an injunction that prevents OASIS from informing its clients where they can receive services.  OASIS is required to do this as part of its case management services.  Forbidding OASIS from doing this would forbid OASIS from performing its own case management duties under the Lead Agency contract. The balance of the equities in the case at bar favors OASIS.

## IV.    Denying AHF's motion best serves the public interest.

Consideration of the public interest also favors denying the requested injunction.  If OASIS is unable to inform its clients where they can receive care, those clients are less likely to be able to efficiently and effectively access the care they need.  If OASIS loses its status as Area 1 Lead Agency because it is held responsible for AHF's noncompliance, there could be a substantial disruption in the

provision of Ryan White Part B services in Area 1 until another entity could step in and resume its coordination and oversight roles.

It is worth noting that AHF was not—and has never been, at any relevant time—the sole provider of Ryan White Part B services in Area 1. OASIS provides case management services directly to its clients, and subcontracts with a variety of other entities to provide case management and other services to Ryan White Part B clients in Area 1. (Ex. G at 3–4.) Fewer than one hundred such clients have been required to change providers because of the termination of the 2023 Contract. But if OASIS were unable to inform its clients where to seek care, or were to lose its Lead Agency status, every single person receiving Ryan White Part B services in Area 1 could be at least temporarily impacted by that change. This factor also favors OASIS.

## CONCLUSION

For the foregoing reasons, this Court should deny AHF's Emergency Motion for Preliminary Injunction (ECF No. 8).

*[SIGNATURE ON FOLLOWING PAGE]*

Respectfully submitted,

**CLARK PARTINGTON**

By: */s/ Daniel E. Harrell*
**DANIEL E. HARRELL**
Florida Bar Number 105222
**DOUGLAS ALAN BATES**
Florida Bar Number: 0791431
P.O. Box 13010
Pensacola, FL  32591-3010
Phone: (850) 434-9200
Fax: (850) 432-7340
dharrell@clarkpartington.com
dbates@clarkpartington.com

**BAILEY HOWARD**
Florida Bar Number: 1002258
215 S. Monroe St., Suite 530
Tallahassee, FL 32301
Phone: (850) 320-6831
Fax: (850) 597-7591
bhoward@clarkpartington.com

*Attorneys for Defendant, Okaloosa Aids Support and Informational Services, Inc., a/k/a "OASIS"*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

I hereby certify that this memorandum contains 7641 words, excluding the case style, signature block, certificate of service, and this certificate itself.


*/s/ Daniel E. Harrell*
**DANIEL E. HARRELL**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been filed with the Clerk of the Court and furnished electronically via the CM/ECF Filing System to the following on this 3rd day of July, 2023:

Kendall Coffey, Esq.
Sergio E. Molina, Esq.
Coffey Burlington, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, FL 33133
kcoffey@coffeyburlington.com
lperez@coffeyburlington.com
service@coffeyburlington.com
smolina@coffeyburlington.com
bdiaz@coffeyburlington.com
*Counsel for Plaintiff*

Katelyn R. Boswell, Esq.
Chief Legal Counsel
Alyssa T. Silva, Esq.
Assistant General Counsel
Office of the General Counsel
Florida Department of Health
4052 Bald Cypress Way, Bin A-02
Tallahassee, FL 32399-1708
Katelyn.boswell@flhealth.gov
Alyssa.silva@flhealth.gov
*Counsel for Defendant, Florida Department of Health*

*/s/ Daniel E. Harrell*
**DANIEL E. HARRELL**