### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

AIDS HEALTHCARE
FOUNDATION, INC.,

      Plaintiff,

v.                          Case No. 4:23-cv-230-MW/MAF

OKALOOSA AIDS SUPPORT AND
INFORMATIONAL SERVICES, INC.,
a/k/a "OASIS," et al,

      Defendants.

_____/

### DEFENDANT OKALOOSA AIDS SUPPORT AND INFORMATIONAL SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendant, Okaloosa AIDS Support and Informational Services, Inc. ("OASIS"), respectfully requests this Court enter final summary judgment in favor of OASIS and against Plaintiff, AIDS Healthcare Foundation, Inc. ("AHF"), on all claims.  In support, OASIS states as follows.

### STATEMENT OF UNDISPUTED FACTS

*The Ryan White Program*

In 1990, Congress enacted a program "to provide emergency assistance to localities that are disproportionately affected by the [HIV] epidemic" and provide financial assistance to the States in order to enable "more effective and cost efficient

1

systems for the delivery of essential services to individuals and families with HIV disease."  Ryan White Comprehensive AIDS Resources Emergency Act of 1990, Pub. L. No. 101-381, § 2, 104 Stat. 576 (1990).  The program is known as the Ryan White Program, taking its name from the act's title.  (ECF No. 8-1 at 2.)

The federal government provides funds to the State of Florida through the Ryan White Program to allow Florida to provide the requisite services to low-income Floridians living with HIV and AIDS.  (*Id.*)  The Florida Department of Health ("DOH") administers these funds and distributes them to providers, who provide services.  (*Id.*)  Since 2020, DOH has contracted with OASIS to provide services through the Ryan White Program in Northwest Florida (known as Area 1).  (ECF No. 23-7 at 3; *see also* ECF No. 1-1 (contract between DOH and OASIS ("Lead Agency Contract")).)  In this role—referred to as the Lead Agency role—OASIS subcontracts with entities like AHF to provide services to clients, oversees the provision of those services, and works to make delivery of services more effective and efficient to clients throughout the Area 1 region.  (ECF No. 23-7 at 3–5.)  When OASIS subcontracts in this way, it remains fully responsible for the subcontractor's work in providing Ryan White Part B services, including documentation and reporting requirements.  (ECF No. 1-1 at 7, 16–24.)

The State of Florida's Ryan White Part B Patient Care Program Administrative Guidelines instruct that part of the "essential role" a Lead Agency

2

plays includes the "role[] and responsibilit[y]" of "[d]eveloping local service delivery guidelines *with service limits*." (ECF No. 23-3 at 6 (emphasis added).) Pursuant to this mandate, OASIS promulgated its own Area 1 Ryan White Support Services Guidelines ("Area 1 Guidelines") for OASIS and its subcontractors to follow. (ECF No. 23-4.)

*OASIS's Subcontract with AHF*

OASIS began working with AHF to provide services to clients in Northwest Florida in 2020. (ECF No. 23-1 ("2020 Contract").) The 2020 Contract required that AHF "[m]aintain a minimum case load of 60 clients and a maximum of 100 per full-time equivalent (FTE) case manager." (ECF No. 23-1 at 25.)

In an April 2020 letter to OASIS Executive Director Kurt Goodman, AHF's Regional Manager, Dawn Averill, objected to the caseload cap as "arbitrary" and "inconsistent with the regulatory intent of the Ryan White program." (ECF No. 23-2 at 2.) Nevertheless, Averill stated, AHF would "execute the contract 'as-is' to ensure the continuity of services for the patients." (*Id.*) Goodman responded by explaining the reasons for OASIS's decision to impose the cap, including the independent 2017–18 Comprehensive HIV/AIDS Needs Assessment's recommendation that, although caseloads of between seventy-five and one hundred clients per case manager were acceptable, "best practice" dictated caseloads of fewer than seventy-five clients per case manager. (ECF No. 23-2 at 3–4.) Goodman

3

clarified that, as Lead Agency, OASIS had the discretion to subcontract for services and had the authority to provide oversight to subcontractors.  (*Id.* at 4.)  Goodman also acknowledged "the strained relationship that has existed between OASIS and AHF" and invited Averill to talk with him about it in attempt to ensure open communication and mend fences.  (*Id.* at 4–5.)

OASIS and AHF renewed the contract in 2021 and again in 2022.  (ECF No. 23-7 at 6; ECF No. 1-2 ("2022 Contract").)   In January 2021, while the 2020 Contract was still in force, OASIS also promulgated Area 1 Guidelines that required case managers to "maintain a caseload of not less than 60 clients and not more than 100 clients."  (ECF No. 23-4 at 8.)  The 2022 Contract did not explicitly include the caseload cap, but was otherwise substantially the same as the 2020 Contract.  (*See generally* ECF No. 1-2.)  It obliged AHF to provide clients with both primary outpatient medical care and case management services.  (*Id.* at 2.)  In terms of case management, this required AHF to screen potential clients for eligibility, assess their service needs and develop individual care plans for each client, coordinate access to care and continually monitor the effectiveness of the care plan, educate and counsel clients about adherence to treatment, link clients to services, and advocate for individual clients when necessary.  (ECF No. 8-1 at 3.)

The 2022 Contract required AHF to "maintain an adequate administrative and organizational structure sufficient to complete the deliverables under this contract,"

which included providing case management services as specified therein. (ECF No. 1-2 at 9, 11.) It also required AHF to maintain a minimum caseload of sixty eligible clients per full-time equivalent case manager. (*Id.* at 7, 9.) And the 2022 Contract permitted either party to terminate it "without cause, with no less than thirty (30) calendar days' notice in writing to the other party." (*Id.* at 1.) The 2022 Contract provided it could be renewed for up to three years "by mutual agreement" in writing "and is subject to the same terms and conditions set forth in the original contract," provided the parties agreed in writing to that renewed contract. (*Id.* at 15.)

In late 2022, during an audit of AHF's documentation and reporting, OASIS discovered that AHF was missing a substantial amount of required documentation, and that at least two of AHF's case managers had caseloads of more than 100 clients. (ECF No. 23-7 at 6; *see also* ECF No. 23-5.) Goodman wrote to AHF in March 2023, reminding them of the caseload limit and noting that two of AHF's Area 1 case managers had more than 120 clients. (ECF No. 23-6 at 2.) Goodman committed to funding an additional case manager position at AHF when funds became available to do so, and informed AHF that, in addition to the Area 1 Guidelines' caseload cap, the next subcontract between OASIS and AHF would also contain that cap. (*Id.* at 3.)

Averill responded to Goodman roughly two weeks later, stating bluntly that "AHF does not cap services." (*Id.* at 4.) Averill also asked for clarification about

apparent differences in language between versions of the Area 1 Guidelines. (*Id.*) On March 27, 2023, Goodman replied, quoting the caseload limitation language from the Area 1 Guidelines and reaffirming OASIS's position that case managers need a caseload of fewer than one hundred clients to effectively provide the required services. (*Id.* at 6.) Goodman detailed some of the difficulties OASIS had experienced with obtaining compliance from AHF, noted that OASIS had not experienced similar issues with any other Area 1 subcontractor, and directed AHF to cease its behavior. (*Id.* at 7.)

In April 2023, the parties executed the agreement at issue in this case ("the 2023 Contract"). For the most part, the 2023 Contract has the same terms and imposes the same requirements as the 2022 Contract: it included the same requirement to maintain a staffing level adequate to ensure services were properly delivered (ECF No. 1-3 at 8); it contained the same sixty-case minimum caseload (*id.* at 6); and it contained the same termination-at-will clause (*id.* at 2). In addition to the minimum caseload, the 2023 Contract set a maximum caseload of one hundred cases per full-time equivalent case manager. (*Id.* at 6.)

In mid-April, Goodman wrote to Averill again, detailing the problems with AHF's refusal to comply with the 2023 Contract's caseload limit, including required documentation that was missing, and providing "final notice" that OASIS would terminate the 2023 Contract if AHF continued not to comply with it. (ECF No. 23-

6 at 8–10.)  On April 25, 2023, the Deputy Bureau Chief of AHF's Southern Bureau, Russell Walker, emailed Averill and other AHF staff, as well as Goodman, stating that Walker and Goodman had agreed in the interim that AHF would pay a financial penalty for its caseload in excess of the 2023 Contract's limit and would not reduce its caseload.  (*Id.* at 11–12.)  Goodman replied the next day, clarifying that he had not agreed to allow AHF to continue to increase its caseload "and simply apply financial consequences."  (*Id.*)  Goodman repeated his plea for AHF to comply with the 2023 Contract, noted again the delays in services clients were experiencing and the missing paperwork due to AHF's excess caseload, and asked for confirmation that AHF would operate within the applicable limitations.  (*Id.*)

In light of AHF's point-blank refusal to follow the requirements of the 2023 Contract, the deteriorating relationship with AHF, and the potential risk to OASIS's Lead Agency Contract posed by AHF's refusal to comply, OASIS provided notice on May 1, 2023, that it was exercising its right to unilaterally terminate the 2023 Contract effective June 1, 2023.  (ECF No. 1-4 at 2.)  Prior to issuing this notice of termination of the 2023 Contract, OASIS received approval for this action from the DOH Contract Manager, Jennifer Hill.  (ECF No. 64-1 at 4.)  The 2023 Contract ultimately terminated June 1, 2023.

OASIS fully paid AHF for all services provided under the 2023 Contract. (ECF No. 64-1 at 4.)  No amount is outstanding, and no amount owed to AHF under

the 2023 Contract remains unpaid.  (*Id.*)  Moreover, the manner in which OASIS compensated AHF for providing case management services under the 2023 Contract (and prior agreements) was not contingent on the number of patients managed by each case manager.  Instead, AHF was compensated a flat fee based on the number of full-time case managers providing case management services regardless of whether that case manager serviced the minimum of 60 patients or exceeded the caseload cap of 100 patients.  (ECF No. 64-1 at 4-5.)  In other words, there was no per-patient financial incentive to AHF to exceed the caseload cap of 100. (*Id.*)

*Transition of Services and Notification of Patients*

Prior to serving AHF notice of the termination of the 2023 Contract, OASIS already had a relationship with CAN Community Health ("CAN") to provide services under the Ryan White program in Area 1.  (ECF No. 64-1 at 5.)  After providing AHF the notice of termination of the 2023 Contract with AHF, OASIS renegotiated its contract with CAN so as to allocate additional funds to CAN for services that CAN would assume in light of the termination of AHF's 2023 Contract. (*Id.*)  Prior to the notice of termination of the 2023 Contract, OASIS did not enter into specific negotiations with CAN regarding additional services and CAN did not incentivize OASIS in any way to transition services to it. (*Id.*)

As the Lead Agency for Area 1, OASIS is responsible for all patients who receive Ryan White services in Area 1.  (ECF No. 64-1 at 6.)  In other words, all

patients who receive Ryan White services through AHF, CAN or any other subcontractor of OASIS also have a relationship with OASIS, which acts as the Lead Agency and is ultimately responsible to DOH for ensuring Ryan White services are provided to Area 1 patients.  (*Id.*)  Consequently, when OASIS provided notice of termination of the 2023 Contract to AHF, OASIS had an obligation to inform patients receiving Ryan White services in Area 1 of this event and the potential impact it may have on services provided.   (*Id.*)

## PROCEDURAL HISTORY

AHF filed a four-count Complaint, alleging claims for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), tortious interference with business relationships (Count III), and a claim for a declaratory judgment and injunctive relief (Count IV).  (ECF No. 1.)  On OASIS's motion (ECF No. 20), this Court dismissed the Complaint in part (ECF No. 47). Specifically, this Court held Count I failed to state a claim to the extent AHF relied on the theory that OASIS allegedly breached the 2023 Agreement by terminating that agreement in bad faith, but concluded Count I stated a claim on the theory that OASIS breached the 2023 Agreement by imposing the caseload cap.  (*Id.* at 6–7.) This Court applied the same reasoning to Count II.  (*Id.* at 7–9.)  On Count III, this Court reasoned AHF stated a sufficient claim "by the skin of its teeth," and denied OASIS's motion.  (*Id.* at 9–12.)  And this Court dismissed Count IV outright, holding

9

that no prospective relief was available to AHF after OASIS terminated the 2023 Agreement.  (*Id.* at 12–15.)  AHF then filed its Answer and Affirmative Defenses. (ECF No. 48.)

AHF also moved for an emergency preliminary injunction (ECF No. 8), which OASIS opposed (ECF No. 23).  After holding an evidentiary hearing and considering the parties' post-hearing memoranda (ECF Nos. 35 & 36), this Court denied AHF's motion for preliminary injunction (ECF No. 46).  This Court concluded AHF had not shown a substantial likelihood it would succeed on any of its three remaining claims.  (*Id.* at 7.)  On Count I, this Court concluded the caseload cap did not conflict with either Florida or federal law, and thus did not breach the 2023 Agreement.  (*Id.* at 8–21.)  This Court further concluded AHF was unlikely to succeed in showing OASIS breached the 2023 Agreement by terminating it.  (*Id.* at 21–41.)  This Court applied the same reasoning to Count II, and reached the same conclusion: AHF was unlikely to succeed on the merits of its implied-covenant claim.  (*Id.* at 41.)  This Court also held Count III was unlikely to succeed on the merits, reasoning that OASIS was not a stranger to AHF's client relationships, that AHF had not established that OASIS had contacted any of AHF's clients who fell outside the scope of the 2023 Agreement, and that OASIS's interference with any such relationships was privileged absent malice, ulterior purposes, or improper methods on OASIS's part, none of which AHF had shown. (*Id.* at 42–47.)

## LEGAL STANDARD

A party is entitled to summary judgment on any claim or defense, or part thereof, where "there is no genuine dispute of material as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact only exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996).  And such evidence must be evidence that would be admissible at trial, or that could be reduced to an admissible form.  *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).  This Court has discretion to consider parts of the record the parties do not specifically cite to, but need not do so.  Fed. R. Civ. P. 56(c)(3); N.D. Fla. Loc. R. 56.1(F).

## ARGUMENT

### I.    OASIS is entitled to summary judgment on Counts I and II because it did not breach the 2023 Agreement.

Florida law implies a covenant of good faith and fair dealing in every contract.  *Chalfonte Condo. Apt. Ass'n, Inc. v. QBE Ins. Corp.*, 695 F.3d 1215, 1224 (11th Cir 2012) (citations omitted).  But "a cause of action for breach of the implied covenant cannot be maintained … in the absence of breach of an express term of the underlying contract."  *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1318 (11th Cir. 1999).

11

This means, in this case, that Counts I and II travel together.   There is no genuine dispute under the facts of record and the applicable law that OASIS did not breach the 2023 Agreement.   By extension, OASIS did not breach the implied covenant.   OASIS therefore is entitled to summary judgment on Counts I and II.

### A.   The caseload cap did not breach the 2023 Agreement.

AHF claims OASIS breached the 2023 Agreement by "introducing" the caseload cap, which AHF claims was "new and arbitrary" and illegal. (ECF No. 1 at 8.)   But, as this Court has explained in its order denying AHF's motion for preliminary injunction, the caseload cap does not violate Florida law, and is neither arbitrary nor unreasonable.[1]

### 1.   The caseload cap does not violate Florida law.

AHF alleges the caseload cap violates Florida law in three ways: by conflicting with the provision of the Lead Agency Agreement that requires OASIS to incorporate the terms of the standard Lead Agency Agreement into the 2023 Agreement (ECF No. 1 at 4; ECF No. 1-1 at 7); by being incorporated into the Lead

---

[1]       In its order denying AHF's motion for preliminary injunction, this Court devoted considerable attention to analyzing OASIS and AHF's status under federal procurement law to determine whether the caseload cap violated any federal regulations. (ECF No. 46 at 12–21.) This Court concluded that analysis by explaining AHF "ha[d] not shown a substantial likelihood of success on the merits as to its argument that [OASIS's] imposition of the caseload cap in the 2023 Agreement constituted a breach of the 2023 Agreement" by violating federal regulations. (*Id.* at 21.)  But AHF did not plead violations of any federal regulation in Count I or II—only in Count IV, which this Court has dismissed for failure to state a claim. (ECF No. 47 at 12–15.)  To grant summary judgment on Counts I and II, this Court need not consider federal procurement law.

Agency Agreement without OASIS having first obtained DOH's permission to incorporate it (ECF No. 1 at 4); and by conflicting with DOH's HIV/AIDS Patient Care Program Administrative Guidelines ("DOH Guidelines"), which require "[a]ll subcontracts" to "contain language and restrictions like the primary contract" and to "model" the Lead Agency Contract (*id.* at 12).  OASIS takes each in turn.

First, the caseload cap does not conflict with the Lead Agency Agreement. The Lead Agency Agreement says nothing whatsoever about a maximum caseload: it requires only that a provider "maintain a minimum case load of 60" clients per case manager.  (ECF No. 1-1 at 17.)  There is no conflict here.

Second, the contention that the caseload cap violates Florida law because OASIS did not seek permission from DOH to incorporate it into the 2023 Agreement proceeds from a false premise: OASIS was not required to seek such permission. The Lead Agency Agreement requires OASIS to seek permission from DOH for "[a]ny modifications, amendments or termination of any subcontract agreements." (ECF No. 1-1 at 20.)  But the caseload cap was none of those things.  The 2023 Agreement was not a simple renewal or modification of the 2022 Agreement, it was a new agreement that began conterminously with the end of the 2022 Agreement. The 2022 Agreement contemplated renewals on the same terms as the 2022 Agreement, but it did not make such renewals the exclusive means for the parties to have a future relationship after the 2022 Agreement ended.  (*See* ECF No. 1-2 at 15

(providing that the 2022 Agreement may be renewed on the same terms, but not providing that it must "only" or "exclusively" be so renewed).)  The Lead Agency Agreement did not require OASIS to seek DOH's permission to impose the caseload cap.  There is no conflict here, either.

Third, the caseload cap does not violate the DOH Guidelines.  Those only require that the 2023 Agreement "contain language and restrictions like the primary contract, including scope of work" and "model" the Lead Agency Contract.  (ECF No. 1 at 12.)  As this Court has explained, "model" does not require exact duplication: so long as the model is not contrary to the original, the requirement is met.  (ECF No. 46 at 11.)  The 2023 Agreement easily satisfies these requirements. Furthermore, even the DOH Guidelines themselves assign OASIS the responsibility to "[d]evelop[] local service delivery guidelines with service limits."  (ECF No. 23-3 at 6.)  Adopting the caseload cap did not violate the DOH Guidelines, but instead was something the DOH Guidelines expressly allowed OASIS to do.

### 2.   The caseload cap is not arbitrary.

In its Complaint, AHF alleges the caseload cap is an arbitrary requirement. The record before this Court establishes that it is not.  The caseload cap implemented by OASIS arose out of the Northwest Florida AIDS Consortium's Comprehensive HIV/AIDS Needs Assessment for Florida's Area 1 performed in 2017-2018 (the "Needs Assessment").  (ECF No. 64-1 at 3-4, 8-65.)  This Needs Assessment

14

specifically recommended that, as a short-term goal, limiting caseloads for case managers in Area 1 to 75-100 cases was appropriate.  (ECF No. 64-1 at 3-4, 34, 59).  The Needs Assessment also recognized that, "as a long-term goal, best practice supports that the number of active cases to case managers should aim to be below 75, depending on case complexity."  (*Id*.)  Based on this report, OASIS made the decision to cap caseloads at 100, which is in line with the short-term goal recognized by this Area 1-specific Needs Assessment recommendation.  (*Id*.)  While AHF may disagree with the Needs Assessment or the concept that a caseload cap is necessary for Area 1, it cannot demonstrate that OASIS acted arbitrarily in implementing a caseload cap based on this recommendation.

### 3. AHF cannot prove that it suffered any damages as a result of the caseload cap.

"Under Florida law, a breach of contract claim requires proof of (1) a valid contract; (2) a material breach and (3) resulting damages."  *Crom, LLC v. Preload, LLC*, 380 F. Supp. 3d 1190, 1200 (N.D. Fla. 2019) (citing *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) and *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2d DCA 2006)).  Assuming *arguendo* that AHF could demonstrate that the caseload cap did result in a breach—which it cannot—AHF's breach of contract claim still fails because AHF cannot prove that it suffered any damages as a result of the caseload cap.

15

Under the Ryan White program, OASIS compensated AHF for case management services based on the number of case managers providing case management services, regardless of the number of patients.  (ECF No. 64-1 at 4-5.) In other words, the number of patients for whom AHF provided case management services had no impact whatsoever on how much OASIS paid AHF for case management services.  (*Id.*)  Whether a case manager had a case load of 75 or 175, AHF still received the same compensation for that case manager's services. Accordingly, AHF can point to no damage that it suffered because of the imposition of the caseload cap.  Furthermore, it is undisputed that OASIS has fully compensated AHF for all case management services provided through the termination date of the 2023 contract.  (*Id.*)  Accordingly, AHF cannot prove damages so its breach of contract claim fails as matter of law.

Of equal importance, under Rule 26(a)(1)(A)(iii), a party is required to disclose "a computation of each category of damages claimed by the disclosing party[.]" Fed. R. Civ. P.  26(a)(1)(A)(iii).  AHF's initial disclosures provide the following:

> AHF's damages include consequential damages in the form of lost revenue resulting from the loss of clients for case-management and outpatient medical services as a result of OASIS's misconduct. These damages include loss of $240,000 in revenue anticipated under AHF's agreement with OASIS, and other consequential lost revenue, including lost pharmacy revenue resulting from the loss of current and future clients, an amount which AHF has not yet calculated. ***AHF will amend its***

> ***disclosures to include additional calculations of damages as***
> ***discovery progresses***.[2]

(ECF No. 64-2 at 6 (emphasis added).)  AHF never amended or supplemented these

disclosures and never provided any other information regarding a calculation of this

purported "consequential lost revenue."  Consequently, to the extent that AHF now

may attempt to identify a specific calculation of damages related to the caseload cap,

this Court should exclude such evidence pursuant to Rule 37(c)(1) because AHF did

not properly disclose it.  *See* Fed. R. Civ. P. 37(c)(1); *Browning v. Bay Radiology*

*Assocs., P.L.*, No. 5:21-CV-237-AW-MJF, 2023 WL 7131838, at *3 (N.D. Fla. Aug.

1, 2023) ("'If a party fails to provide information as required by Rule 26(a) or (e),'

then Rule 37 permits the district court to order that 'the party is not allowed to use

that information unless the failure was substantially justified or harmless.'")

(quoting *Circuitronix, LLC v. Kinwong Elec. (Hong Kong) Co.*, 993 F.3d 1299, 1307

(11th Cir. 2021) (cleaned up)).

### B.   Terminating the 2023 Agreement did not breach that agreement.

AHF also claimed OASIS breached the 2023 Agreement by terminating it in

bad faith; *i.e.*, because of AHF's persistent refusal to comply with the caseload cap.

---

[2] It should be noted that the maximum amount of revenue that AHF could receive under the contract at issue between OASIS and AHF totaled $240,000.00, broken down as follows: "not to exceed $115,000 for primary medical care, $5,000 for specialty care, and $120,000 for case management services."  (*See* ECF No. 1-2, p. 2)  Accordingly, identifying "$240,000 in revenue anticipated under AHF's agreement with OASIS" is clearly related to the termination of the agreement and not specifically related to damages suffered as a result of the caseload cap.

17

(ECF No. 1 at 8.)  This Court previously held that AHF failed to state a claim for breach of contract based on this theory because it "does not exist under Florida law." (ECF No. 47 at 6.)  To the extent AHF may argue Counts I and II survive summary judgment on this theory, this Court has already concluded Florida law belies this, and such an argument would not disentitle OASIS to judgment as a matter of law on Counts I and II.

AHF further contends that OASIS breached the 2023 Agreement by terminating it without obtaining the necessary permission from the DOH contract manager first.  (*See* ECF No. 1-1 at 20 (requiring approval from the contract manager for "[a]ny modifications, amendments or termination of any subcontractor agreements").  But the record conclusively establishes that OASIS did obtain that permission.  (ECF No. 64-1 at 4.)  OASIS is entitled to summary judgment on Counts I and II insofar as they relate to the termination of the 2023 Agreement.

## II.   There is no genuine dispute of material fact that, to the extent OASIS interfered with any of AHF's client relationships, that intervention was privileged.

AHF claims in Count III that OASIS tortiously interfered with its client relationships by contacting AHF's Ryan White clients, informing them that they could no longer receive services from AHF, and directing them to what AHF describes as a "favored" provider—though AHF never specifies who that provider

is supposed to have been.  (ECF No. 1 at 10–11.)  AHF accuses OASIS of acting "in bad faith and with a conspiratorial motive."  (*Id.* at 10.)

The elements of tortious interference with a business relationship are "'(1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.'" *Ozyesilpinar v. Reach PLC*, 365 So. 3d 453, 460 (Fla. 3d DCA 2023) (quoting *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla.1985)). Here, AHF's tortious interference claim fails as a matter of law because it cannot produce evidence of any business relationship with which OASIS intentionally and unjustifiably interfered.  Even if it could, though, AHF has not disclosed any damages associated with any purported interference.

First, the evidence clearly shows that OASIS is not a "third party" or "a stranger to the business relationship" in question.  *Palm Beach Cnty. Health Care Dist. v. Pro. Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009).  The individuals receiving Ryan White services through AHF in Area 1 are not just AHF's clients, but they are OASIS's clients too, because OASIS is the Lead Agency responsible for delivering those services to them.  *See id.* ("An interested third-party accused of tortious interference is essentially 'interfering' with its own interests. This is not interference; it is freedom of contract.").  As the Lead Agency, OASIS

19

"has a supervisory interest in how the relationship [between AHF and the Ryan White clients] is conducted" and so "cannot be held liable for tortious interference" in those relationships. *Id.* Where, as here, the relevant relationship only exists because of OASIS's facilitation and approval of it, and that relationship is therefore under OASIS's ultimate control, it is no tort to "interfere" with that relationship. *Id.*; *see also Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 (11th Cir. 2001); *Alexis v. Ventura*, 66 So. 3d 986, 988 (Fla. 3d DCA 2011).

This is sometimes referred to as a privilege of interference. *See O.E. Smith's Sons, Inc. v. George*, 545 So. 2d 298, 299 (Fla. 1st DCA 1989) (referring to "the privileged interference enjoyed by a party that is integral to the business relationship"). Such privilege "is not absolute. The privilege is divested when the defendant 'acts solely with ulterior purposes'" and contrary to its own best interests. *Id.* (quoting *Sloan v. Sax*, 505 So. 2d 526, 528 (Fla. 3d DCA 1987)). The privilege also does not apply where the interfering defendant employs improper methods, such as "threats, intimidation and conspiratorial conduct," "the purposeful causing of a breach of contract," or misrepresentations. *See KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1326–27 (11th Cir. 2004) (citations omitted) (collecting cases); *M & M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1340 (11th Cir. 2020) (recognizing that the improper-methods exception applies to a contractor's otherwise-privileged interference between a subcontractor and the

20

subcontractor's employee, and citing *McCurdy v. Collis*, 508 So. 2d 380 (Fla. 1st DCA 1987)).

AHF has admitted that OASIS is not a stranger to these relationships.  (ECF No. 8 at 2 (citing ECF No. 1 at ¶¶ 7–10); *see also* ECF No. 1-1 at 20–21.)  This Court has previously concluded that OASIS's "interference in the relationship between [AHF] and its Ryan White clients is privileged absent malice, ulterior purposes, or improper methods."  (ECF No. 46 at 46.)  AHF can show none of these.  There is no evidence that OASIS acted with malice or an ulterior motive.  There is no evidence of any conspiracy for OASIS to interfere with any of AHF's relationships.  There is no evidence that OASIS agreed with anyone that it would improperly divert clients from AHF to another provider. And the record conclusively establishes that OASIS had no financial incentive to terminate the 2023 Agreement.  (*See* ECF No. 64-1 at 5-6.)

Even conduct "tinged with animosity and malice, does not give rise to a cause of action for interference with a contractual relationship" if the defendant "engaged in [it] for legitimate purposes."  *Menendez v. Beech Acceptance Corp.*, 521 So. 2d 178, 180 (Fla. 3d DCA 1998).  OASIS had a legitimate purpose for its actions: ensuring Ryan White services in Area 1 were carried out in what it reasonably judged to be the most prudent manner.  OASIS was acting as "an aggressive caretaker of public funds," "seeing that the money is spent wisely and prudently."  *Palm Beach*,

13 So. 3d at 1094.  OASIS had every right to do this based on its role as the Lead

Agency.

AHF also cannot demonstrate that OASIS interfered with any client

relationships outside the scope of the Ryan White program—in other words,

relationships it would not be privileged to interfere with.  Florida law provides that

> As a general rule, an action for tortious interference with a
> business relationship requires a business relationship evidenced
> by an actual and identifiable understanding or agreement which
> in all probability would have been completed if the defendant
> had not interfered. . . . [A plaintiff must] 'show with reasonable
> certainty the elements of tortious interference, [including]
> evidence of unjustified interactions with specific parties known
> to be involved, or likely to be involved, in an advantageous
> business or contractual relationship....'

*Ozyesilpinar*, 365 So. 3d at 460–61 (*Chevaldina v. R.K./FL Mgmt., Inc.*, 133 So. 3d

1086, 1090 (Fla. 3d DCA 2014)).  AHF has not disclosed any specific such client

relationship with which OASIS interfered.  It did not identify any client in its Rule

26 disclosures that could support such a claim of interference.  AHF cannot rely on

the theory of tortious interference in a vacuum but instead must plead and prove

specific relationships with which OASIS purportedly interfered.  It has not done so

and cannot do so.

Finally, similar to its breach of contract claims, AHF failed to disclose any

damages associated with any purported tortious interference.  As noted in Section I,

A, 3, *supra*, AHF only identified "consequential damages" for OASIS's alleged

misconduct.  AHF specifically provided that it was entitled to "other consequential lost revenue, including lost pharmacy revenue resulting from the loss of current and future clients, an amount which AHF has not yet calculated. ***AHF will amend its disclosures to include additional calculations of damages as discovery progresses***."  (ECF No. 64-2 at 6) (emphasis added).)  But AHF never amended its disclosures to provide any "additional calculations of damages."  Consequently, as set forth above, any attempt to now provide a specific calculation of damages related to its tortious interference claim should be excluded pursuant to Rule 37(c)(1) because AHF did not properly disclose it.  Because AHF cannot prove damages, its tortious interference claim fails as a matter of law.

## CONCLUSION

For the foregoing reasons, this Court should enter final summary judgment for OASIS on Counts I through III.

*[SIGNATURE ON FOLLOWING PAGE]*

23

Respectfully submitted,

**CLARK PARTINGTON**

*/s/ Daniel E. Harrell*
**DANIEL E. HARRELL**
Florida Bar Number 105222
**DOUGLAS ALAN BATES**
Florida Bar Number: 0791431
P.O. Box 13010
Pensacola, FL  32591-3010
Phone: (850) 434-9200
Fax: (850) 432-7340
dharrell@clarkpartington.com
dbates@clarkpartington.com

**BAILEY HOWARD**
Florida Bar Number: 1002258
215 S. Monroe St., Suite 530
Tallahassee, FL 32301
Phone: (850) 320-6831
Fax: (850) 597-7591
bhoward@clarkpartington.com

*Attorneys for Defendant, Okaloosa Aids Support and Informational Services, Inc., a/k/a "OASIS"*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 56.1(E)</u>

I hereby certify that this motion and memorandum of law contains 5,582 countable words according to the word-count function of the word-processing system used to prepare them.

*/s/ Daniel E. Harrell*
**DANIEL E. HARRELL**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been filed with the Clerk of the Court and furnished electronically via the CM/ECF Filing System to the following on this 12th day of April, 2024:

Kendall Coffey, Esq.
Sergio E. Molina, Esq.
Coffey Burlington, P.L.
2601 South Bayshore Drive, Penthouse One
Miami, FL 33133
kcoffey@coffeyburlington.com
lperez@coffeyburlington.com
service@coffeyburlington.com
smolina@coffeyburlington.com
bdiaz@coffeyburlington.com
*Counsel for Plaintiff*

*/s/ Daniel E. Harrell*
**DANIEL E. HARRELL**