Kurt Goodman
January 08, 2024

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

_____

AIDS HEALTHCARE FOUNDATION, INC.,

         Plaintiff,

vs.            CASE NO.:  4:23-CV-00230-MW/MAF

OKALOOSA AIDS SUPPORT AND
INFORMATIONAL SERVICES, INC.,
a/k/a 'OASIS',

         Defendant.
_____/


VIDEOTAPED DEPOSITION OF KURT GOODMAN
(Volume I pages 1-108)

Taken on Behalf of the Plaintiff


DATE TAKEN:  Monday, January 8th, 2024
TIME:        9:24 a.m. - 3:37 p.m.
PLACE:       Clark Partington
             125 East Intendencia Street
             Pensacola, Florida  32502


Examination of the Witness reported by:

Sue Lynn Martin, CCR
Notary Public, State of Florida


ANCHOR COURT REPORTING
229 South Baylen Street
Pensacola, Florida  32502

Kurt Goodman
January 08, 2024                                    19

1           A.      They were mostly mental health providers.

2    Dental service providers.

3           Q.      Who were they?

4           A.      Okay.  So the dental service provider was

5    Midtown Dental, who we still do business with.

6                   The Center for Compassionate Care for

7    Mental Health Services.  We had another mental health

8    provider over in Fort Walton, Phoenix, she's no longer

9    with us.  I'd have to go back and actually look to see

10   what her last name was.

11          Q.      Prior to 2020, prior to OASIS being the

12   lead agency --

13          A.      Uh-huh. (Affirmative).

14          Q.      -- did OASIS have any contractual

15   relationship with CAN Community Health?

16          A.      Prior to us becoming lead agency?

17          Q.      Yes.

18          A.      Did we have a contractual agreement --

19          Q.      Yeah.

20          A.      -- with them?

21          Q.      Yeah.

22          A.      I don't know that I would call it -- yeah,

23   I guess you would call it a contract.  It was an

24   agreement.  We had a collaborative agreement.

25          Q.      What was the nature of that agreement?

1    A.    We rented them office space in our
2    building, and we had a 340B agreement or sharing
3    agreement.
4    Q.    Okay.  There's a couple of components to
5    that.  How long has -- is this the -- you referenced the
6    office space in the building -- is that the building
7    that OASIS has offices in Fort Walton Beach?
8    A.    Correct.
9    Q.    And how long has CAN been a subtenant to
10   OASIS at that location in Fort Walton Beach?
11   A.    That was being done even prior to my time
12   at OASIS.  I believe it was 2016 or 2017.
13   Q.    Do you know how long OASIS has been at that
14   location in Fort Walton Beach?
15   A.    Decades.  I don't know the specific time.
16   Q.    So you mentioned a second agreement, you
17   said a 340B sharing agreement?
18   A.    Yes.
19   Q.    Can you describe what you meant by that?
20   A.    So it was an agreement we had with CAN that
21   clients that were seen at that clinic in our building,
22   we would share in the 340B profits.
23   Q.    When you say the 340B profits, what are you
24   describing there?
25   A.    So for example, █████████████████████████

1      ████████████      CAN's pharmacy can buy Delstrigo for

2      a deeply discounted price but then they can turn around

3      and they can charge insurance or clients, you know,

4      retail price.  And that money, the savings between those

5      two prices, is what the 340B savings is, and that money

6      is to be returned back into your local programs.

7           Q.    Okay.  And does OASIS -- do OASIS and CAN

8      have a written agreement regarding this profit sharing?

9           A.    We did.

10          Q.    And did you produce this written agreement

11     in discovery to us?

12          A.    I don't know.  If it was something that was

13     requested, yes.

14          Q.    What's the -- you said it's an agreement to

15     share profits or share proceeds -- what's the split?

16          A.    It was 50/50.

17          Q.    50/50?

18          A.    Uh-huh.  Minus administrative fees and that

19     sort of thing.

20          Q.    Is this agreement limited in scope to

21     patients who come to the Fort Walton Beach location --

22          A.    Correct.

23          Q.    -- or is it for any and all CAN services?

24          A.    The patients in the Fort Walton Beach

25     location.  And by the way, that agreement is not in

Kurt Goodman
January 08, 2024                                    22

 1   place.

 2          Q.    When was that agreement terminated?

 3          A.    When we became lead agency.  I terminated

 4   the agreement.

 5          Q.    That was in 2020?

 6          A.    Yes.

 7          Q.    So the best of your recollection, how much

 8   revenue did OASIS receive, whatever measure you can

 9   recall, monthly or annually, how much revenue did OASIS

10   receive from the sharing agreement with CAN prior to the

11   termination of that agreement?

12          A.    It was under $200,000.

13          Q.    Per year or per month?

14          A.    In total.

15          Q.    For the life of the contract?

16          A.    Yes.

17          Q.    When did that contract begin, if you

18   recall?

19          A.    I don't.

20          Q.    Was that a contract that began before or

21   after you joined OASIS as Program Director?

22          A.    Yes, it was before I was Executive

23   Director.

24          Q.    So between -- sometime prior to -- before

25   you were Executive Director, you said?

Kurt Goodman
January 08, 2024                                    23

1           A.      Uh-huh.  (Affirmative).

2           Q.      Okay.  And you were director -- that was in

3    2019 is when you joined?

4           A.      Yes.

5           Q.      So you can't recall if that agreement was

6    in place in 2018, 2017, 2016?

7           A.      I'm not sure what was in place.  Well,

8    there was nothing different in place than what -- when I

9    became Executive Director, it was the same agreement.

10          But I don't know when specifically it was

11   put in place because that was before my time as

12   Executive Director.

13          Q.      Okay.  That was probably an inartful

14   question on my part.  What I was trying to ask is

15   whether or not this contract existed before or after you

16   joined OASIS in 2017?  Do you know whether or not that

17   contract was in place?

18          A.      I honestly, I don't know.

19          Q.      Okay.  But what you do know is that the

20   contract was in place when you became Executive Director

21   in the Fall of 2019?

22          A.      Correct.

23          Q.      So when you said you believed it generated

24   under $200,000 in revenue, is that the amount of revenue

25   generated between your being -- during the time when you

Kurt Goodman
January 08, 2024                                        24

1     were the Executive Director, or during the life of the

2     contract?

3            A.    That was the life of the contract.

4            Q.    So how did -- so if you -- as you sit here,

5     you don't know when the contract was signed, so how do

6     you know it only generated $200,000 in revenue over so

7     many years?

8            A.    Because I asked for the financial report

9     from my CFO.

10           Q.    Who was your CFO at the time?

11           A.    Her name is Lita Koets.

12           Q.    And so she generated a report that showed

13    the amount of revenue generated from the 340B program?

14           A.    Yes.

15           Q.    Do you recall when roughly this report was

16    provided to you?

17           A.    It would have been -- it would have been

18    right around the time that we were negotiating lead

19    agency.

20           Q.    So in 2020?

21           A.    Yeah.

22           Q.    Okay.  Is Lita Koets -- I've seen some

23    documents that have Lita Koets' name and seen some

24    documents with someone named Bocky --

25           A.    Same person.

Kurt Goodman
January 08, 2024                                    45

```
 1  termination of the contract, no.  I don't believe so.
 2       Q.    Was there some conversation that didn't
 3  reference the termination of the contract where you
 4  asked CAN about their capacity to handle additional
 5  patients?
 6       A.    Yes.
 7       Q.    When was that?
 8       A.    I've had ongoing conversations with CAN
 9  about, particularly, when they were opening the clinic
10  out here, about hours, about availabilities of
11  providers, about how they were going to see clients, you
12  know, ongoing, like they would with any.
13       Q.    Are you done?
14       A.    Yeah.
15       Q.    In April 2023, did you have any
16  communications with CAN about their ability and capacity
17  to handle additional patients in the ambulatory services
18  program?
19            MR. HARRELL:  Objection; asked and
20        answered.
21       A.    I don't believe that I did.
22       Q    (By Mr. Hiaasen) Okay.  Did you have any
23  communications with CAN in April of 2023 regarding
24  whether they would be able or have the desire to provide
25  case management services under the Ryan White program?
```

Kurt Goodman
January 08, 2024                                    46

```
1            A.    Yes.

2            Q.    With whom did you speak?

3            A.    Susan Skinner.

4            Q.    How did that conversation come about?

5            A.    Again, this was not specifically relating

6     to the termination of the contract.  This is a request

7     that CAN has been making for some time.  And so these

8     conversations about them taking on case management have

9     been ongoing.

10           Q.    So are you saying Susan Skinner called you?

11    Or did you call Susan Skinner to discuss case

12    management?

13           A.    Susan Skinner approached me about CAN

14    becoming a case management provider.

15           Q.    And do you recall about when that was,

16    basically, or roughly?

17           A.    I've been having these conversations with

18    her for well over a year so --

19           Q.    Well over a year from today?

20           A.    Well over a year prior to this.

21           Q.    Okay.

22           A.    Basically since I was introduced to Susan

23    and she went to work at CAN and took on this position

24    we've been having these conversations.

25           Q.    So you're saying since 2019 CAN has been
```

1    asking to have a case management?

2          A.    Yes.  Well, I don't know if it was -- since

3    they have opened the north side clinic up there they

4    started asking.

5          Q.    Okay.  Do you know when they opened that

6    clinic?

7          A.    It's been open about a year and a half.  I

8    don't -- I don't know off the top of my head exactly

9    when it opened.

10         Q.    Okay.  Do you see there's a -- the response

11   email from Mr. Patel, do you see that, at 8:19?

12         A.    Yes.

13         Q.    It says thank you for the update.  Do you

14   see that?

15         A.    Yes.

16         Q.    What exactly do you believe he was

17   referring to when he said update?

18               MR. HARRELL:  Objection.  You can answer if

19         you know.

20         A.    I have no idea.

21         Q    (By Mr. Hiaasen) Do you recall speaking with

22   Maurice Moody at DOH on May 1st, 2023?

23         A.    Whether it was on May 1st -- I don't know

24   how to answer that.  I don't know if I talked to him on

25   the 1st or not.

Kurt Goodman
January 08, 2024                              71

```
 1              (Plaintiff's Exhibit Number 4 was marked

 2         for identification.)

 3         Q    (By Mr. Hiaasen) Mr. Goodman, I'm going to

 4    hand you -- make sure I don't screw this up.  I'm going

 5    to hand you what I've marked as Exhibit 4.

 6              It's actually a composite of a case

 7    management report.  Do you see at the bottom right-hand

 8    corner it references Subpoena to CAN.  Do you see that?

 9         A.   Yes.

10         Q.   These are documents that were provided to

11    us by CAN which appear to be monthly reports of their

12    case manager.  Is that what this appears to be to you?

13         A.   It does.

14         Q.   Have you ever seen these reports before?

15         A.   I have.

16         Q.   So these are reports for -- let's look at

17    the first one is for the month of July 2023.  Do you see

18    that?

19         A.   I do.

20         Q.   And it references Nicholas Stone and

21    Jennifer Albrecht.  Those are the two case managers at

22    CAN we discussed, right?

23         A.   Yes, sir.

24         Q.   All right.  So according to this report in

25    the month of June 2023, Mr. Stone was carrying a
```

1    caseload of forty clients, and Ms. Albrecht was carrying

2    a caseload of 35 clients, is that right?

3           A.    That appears to be correct.

4           Q.    Okay.  And under CAN's contract with OASIS,

5    they're supposed to have a minimum caseload of 60 per

6    FTE, correct?

7           A.    We do maintain a minimum of 60 generally,

8    yes.

9           Q.    And that's a requirement that OASIS has as

10   part of it's agency contract with the Department of

11   Health, right?

12          A.    Yes.

13          Q.    So as of June 2023, CAN was not in

14   compliance with it's contract with OASIS, is that

15   accurate?

16          A.    No.

17          Q.    Why is that not accurate?

18          A.    Because we hadn't given them enough clients

19   at this point for them to -- they're still at this point

20   training and getting their case management program off

21   the ground.

22          Q.    In June of 2023, were these two positions

23   Mr. Stone and Mr. Albrecht, Ms. Albrecht, were these two

24   positions funded by the Ryan White program?

25          A.    Yes.

Kurt Goodman
January 08, 2024                                        73

1           Q.    Let's turn to the next page.   It references

2    the case management report from July of 2023.   Do you

3    see that?

4           A.    Uh-huh, yes.

5           Q.    And Mr. Stone had a caseload of 45 clients

6    and Ms. Albrecht had a caseload of 44 clients, is that

7    correct?

8           A.    Appears to be so.

9           Q.    And that's below 60, correct?

10          A.    Yes.

11          Q.    And in July of 2023 those two positions

12   were being funded through the Ryan White program from

13   OASIS, correct?

14          A.    Yes.

15          Q.    Okay.   And in that month the contract with

16   CAN was still in place that required them to have 60

17   patients per case manager, correct?

18          A.    The contract does require that, yes.

19          Q.    Okay.   And the contract between the

20   Department of Health and OASIS requires that, as well,

21   right?

22          A.    It does, uh-huh.

23          Q.    Okay.   And finally in September of 2023,

24   the last page, it's page four, request number 13-004,

25   last page references a September 2023 case manager

Kurt Goodman
January 08, 2024                                    74

1    report.  Do you see that?

2            A.    Yes.

3            Q.    And in September of 2023, it shows Ms.

4    Albrecht having a caseload of 58 clients for her FTE, is

5    that right?

6            A.    Yes.

7            Q.    Okay.  And again, in September 2023, the

8    contract with CAN, between CAN and OASIS, required a

9    minimum of 60, correct?

10           A.    It does, uh-huh.

11           Q.    Were there any financial penalties incurred

12   by CAN under the contract with OASIS as a result of the

13   case managers not maintaining a caseload of 60 per FTE?

14           A.    I did not assess financial penalties.  If

15   that was done in our accounting, I can't answer that

16   question.

17           Q.    Does the accounting department at OASIS

18   have the authority from you to assess financial

19   penalties under the subcontracts with the subcontractors

20   to OASIS?

21           A.    My CFO does, yes.

22           Q.    So as you sit here today, you have no

23   knowledge of whether or not financial penalties were

24   imposed on CAN under the terms of the contract with

25   OASIS?

Kurt Goodman
January 08, 2024                                    75

```
 1         A.    I can't say for sure.
 2         Q.    Okay.  Is it -- in the normal course would
 3  you expect your CFO to inform you if it was imposing --
 4  if he or she was imposing financial penalties under the
 5  contract?
 6         A.    No.
 7         Q.    To your knowledge, has OASIS ever imposed
 8  financial penalties regarding violations of the case
 9  management criteria in it's subcontracts against any
10  subcontractor?
11         A.    Financial penalties, not to my knowledge.
12         Q.    Okay.  But based on your testimony, it's
13  possible that such penalties have been incurred but you
14  weren't informed of them?
15         A.    It's possible.
16         Q.    Okay.  And OASIS' contract with CAN hasn't
17  terminated, correct?
18         A.    No.
19               (Plaintiff's Exhibit Number 5 was marked
20         for identification.)
21         Q     (By Mr. Hiaasen) I'm going to show you a
22  document I've marked as Exhibit 5.  This again, this is
23  another case management report provided by CAN in
24  response to a subpoena.  It references caseloads of it's
25  case managers from October 2023.  Do you see that?
```

Kurt Goodman
January 08, 2024                                      88

1    Sacred Heart.

2            Q.    Is that --

3            A.    Olga Stewart, she's from Sacred Heart.

4            Q.    Okay.  And was Sacred Heart notified that

5    they were over the 100 caseload in April of 2021?

6            A.    Yes, they would have been.

7            Q.    Were they -- did they -- were they --

8    suffer any financial penalties under the contract for

9    being over 100 in April of '21?

10           A.    My answer will be the same as the last time

11   you asked me that.  No, not to my recollection.  And

12   again, I'm not the only one that would do that though.

13                 I will say when it comes to imposing

14   financial penalties, we try to avoid that.

15           Q.    And Sacred Heart's contract wasn't

16   terminated in April of 2021 for violating the contract,

17   was it?

18           A.    No.

19           Q.    Okay.  And the next page ending in Bates

20   number 422, it says Olga Jean Stewart.  Do you see that?

21   That's also Sacred Heart?

22           A.    Yes.

23           Q.    And so in May of 2021 Sacred Heart had more

24   than 100 case management clients per FTE, is that

25   correct?

Kurt Goodman
January 08, 2024                                    89

1          A.     Yes.  She's reporting 100 on her caseload.

2          Q.     Okay.

3          A.     The other number would be -- would have

4    been inactive clients.

5          Q.     Okay.  And same for June, July, August and

6    September of '21?

7          A.     Yes.

8          Q.     Okay.

9          A.     So you can see, obviously, where we started

10   having communication with them about the caseload.

11         Q.     How do you know that?

12         A.     Well, that's what my director of case

13   management would have been -- supposed to do as part of

14   their job at the time is to talk to these case

15   management agencies and the case managers about their

16   caseload and you can see where they fell in line.

17         Q.     And as you sit here today, you don't know

18   whether or not they -- your case management director

19   communicated with Sacred Heart about it's case

20   management caseloads in 2021, do you?

21         A.     I would -- obviously, I don't know

22   100 percent but that would have been my expectation that

23   they would have.

24         Q.     Okay.  Sacred Heart is still a -- is still

25   providing case management services today, correct?

1          A.     They do.

2          Q.     You said you expect that contract to lapse

3    or you don't expect them to renew?

4          A.     I do not expect them to renew next year.

5          Q.     And why do you say that?

6          A.     Olga is ready to retire and this is a

7    program that Sacred Heart runs, basically, through their

8    charity programs.  It costs them more than we provide

9    for them to provide the service and, I think that when

10   Olga retires they're just going to close the program.

11         Q.     So that will require you to find --

12         A.     Yes.

13         Q.     -- an additional service provider?

14         A.     Yes.

15         Q.     Is that the reason why -- is that the sole

16   reason why you were communicating with United Way --

17         A.     Yes.

18         Q.     -- and Community Health, or for any other

19   reasons?

20         A.     Yes.  No, it was because I expect this case

21   management service to go away and I need to replace it.

22                MR. HIAASEN:  Okay.  I'm going to hand you

23         what I'm marking at Exhibit 7.

24                Actually, can you hand that back because I

25         want to make sure it's not the one I made notes

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

_____

AIDS HEALTHCARE FOUNDATION, INC.,

      Plaintiff,

vs.          CASE NO.:  4:23-CV-00230-MW/MAF

OKALOOSA AIDS SUPPORT AND
INFORMATIONAL SERVICES, INC.,
a/k/a 'OASIS',

      Defendant.
_____/


VIDEOTAPED DEPOSITION OF KURT GOODMAN
(Volume II pages 109-216)

Taken on Behalf of the Plaintiff


DATE TAKEN:  Monday, January 8th, 2024
TIME:        9:24 a.m. - 3:37 p.m.
PLACE:       Clark Partington
             125 East Intendencia Street
             Pensacola, Florida  32502


Examination of the Witness reported by:

Sue Lynn Martin, CCR
Notary Public, State of Florida


ANCHOR COURT REPORTING
229 South Baylen Street
Pensacola, Florida  32502

Kurt Goodman Vol II
January 08, 2024                                          147

```
 1   was his office.

 2           Q.    Okay.  So it was a face to face meeting?

 3           A.    Yes.

 4           Q.    Did you receive any written documents that

 5   memorialize the eight identified instances of

 6   documentation issues in your April 19th letter?

 7           A.    No.  I don't believe I did.

 8           Q.    Okay.  And I know I asked this before but

 9   I'll ask again:  Do you recall how you learned the

10   information that you put in your April 19th letter

11   regarding those eight instances, if not by -- if not by

12   writing?

13               MR. HARRELL:  Objection.

14           A.    No.

15               (Plaintiff's Exhibit Number 16 was marked

16       for identification.)

17       Q    (By Mr. Hiaasen) I'm going hand to you what

18   I've marked as Exhibit 16.  To add to the confusion, it

19   was previously marked as Exhibit 17 in the hearing.

20               Do you recall receiving this email from

21   Russell Walker on April 25th of 2023?

22           A.    Yes.

23           Q.    And was this the -- excuse me.  Prior to

24   receiving this email on April 25th, did you have any

25   other communications with anyone at AHF regarding your
```

Kurt Goodman Vol II
January 08, 2024                    153

1          A.    No.  I don't think that's what this would
2    necessarily suggest at all.
3          Q.    What did you understand Mr. Walker to be
4    saying in this paragraph then?
5          A.    I would assume he's talking about working
6    with our management staff to figure out the paperwork
7    issues and the documentation issues to get them worked
8    out, which we've been trying to do with them for months.
9          Q.    It says once we can provide this data we
10   will get to work on cleaning it up, right?  Is that what
11   he says?
12         A.    That's what he says.
13         Q.    Oaky.  Then you wrote back to Mr. Walker --
14   did you address that issue in your email?
15         A.    I don't know.
16         Q.    Did you tell him, oh, if you need any data
17   call Mr. Gabbert, something like that?
18         A.    Yeah, no, I didn't address that
19   specifically.
20         Q.    So looking at your email to Mr. Walker, the
21   second paragraph, kind of middle of the paragraph where
22   you said, well, I've even -- you say 'I've even provided
23   examples of AHF case management issues that validate the
24   policy, and as our audit continues, we're finding a
25   significant amount of additional issues'.  Do you see

1    that?

2           A.    Yes.

3           Q.    What is this audit you're referring to

4    here?

5           A.    The same audit we were talking about

6    earlier that Jeffery and Gaynelle provided when I asked

7    them to audit the case files of AHF clients.

8           Q.    This is in the Spring of 2023, right?

9           A.    I believe that's correct, yes.

10          Q.    Okay.  What did Mr. Gabbert and Giselle --

11          A.    Gaynelle.

12          Q.    Gaynelle, sorry.  What did Mr. Gabbert and

13   Gaynelle provide to you in response to your request

14   exactly?

15          A.    I'm not sure they provided anything to me,

16   other than what I put in these examples here.  I asked

17   for -- asked them to give me eight examples.

18          Q.    Why eight?

19          A.    I don't know.  It's just a number that was

20   in my head.

21          Q.    Okay.  Well, your letter here says the

22   audit continues and we're finding significant amounts of

23   additional issues.  Do you see that?

24          A.    Yes.

25          Q.    What are the additional issues that were

Kurt Goodman Vol II
January 08, 2024                              155

```
 1    found after that letter was written on April 19th?
 2           A.    Continued issues of missing documentation.
 3           Q.    And where is the records of that?
 4           A.    In CAREWare.
 5           Q.    In CAREWare.  How do you know that there's
 6    additional issues beyond those eight?
 7           A.    Because it's been reported to me by my
 8    staff.
 9           Q.    And what did they say?  Who said it?
10           A.    Missing documentation.
11           Q.    Who on your staff told you there's missing
12    documentation --
13           A.    Case managers.
14           Q.    Case managers?
15           A.    My CFO.  My administrative people who are
16    supposed to verify eligibility before we make payments.
17    Missing documentation.
18           Q.    And --
19           A.    And when they pulled the files and started
20    looking at them, they were able to come up with, hey,
21    there's -- you know, we're continuing to see this.
22    There's a lot of client files missing documentation.
23           Q.    And where are -- is there any documentation
24    that OASIS has that memorializes the instances of
25    missing documentation you keep referring to?
```

Kurt Goodman Vol II
January 08, 2024                                    156

1          A.     There may be.  That would be a question for

2     Jeffery.  I don't have it, if there is.

3          Q.     So you were never provided any written

4     material?

5          A.     I was not provided anything like that, no.

6     I asked for eight examples of what was missing so that I

7     could put it in a letter to try to address it.

8                 Because again, at this point I'm still

9     trying to work this out and be nice about it, so I'm

10    trying not to be a dick about it.  I'm just, you know,

11    hey, these are what we're seeing, can you please correct

12    this?

13         Q.     And when Mr. Walker asked you please let us

14    know the examples you're talking about, you expected

15    someone other than yourself to provide that to

16    Mr. Walker?

17         A.     That information had been provided to them.

18         Q.     I asked you previously and you said you had

19    no information about whether it was or not.

20         A.     Let me -- it should have been provided to

21    them through months  -- we're talking all the way back

22    to November and December of 2022 we've been discussing

23    missing documentation.  We've been having verbal

24    conversations with them.  We had in-person meetings,

25    case management meetings about documentation.  This has

Kurt Goodman Vol II
January 08, 2024                    158

1   better asked of Jeffery.

2        Q.    So you don't know whether or not it was

3   included in the monthly reports or not?

4        A.    I don't see those reports.

5        Q.    Okay.  As far as -- so this line, going

6   back to your email, this line in the middle of the email

7   where it says as our audit continues we're finding

8   significant amount of additional issues?

9        A.    Yes.

10       Q.    The basis for that statement was oral

11  communications you had received from other case managers

12  and Mr. Gabbert saying that there's additional issues

13  beyond those eight?

14       A.    Yes.

15       Q.    But no one ever gave you a report, a piece

16  of paper that identified the issues you're talking about

17  in this paragraph?

18       A.    No.

19            MR. HIAASEN:  Okay.  My apologies, I just

20        don't want to overlook something here.

21            MR. HARRELL:  Sure.

22       Q    (By Mr. Hiaasen) So if you would look at the

23  last paragraph, the second to last paragraph, rather,

24  where you write to Mr. Walker on April 26th, 'However, I

25  have a contingency plan in place if I'm forced to make a

Kurt Goodman Vol II
January 08, 2024                           159

1  change'.  Do you see that?

2          A.    Yes.

3          Q.    What is this contingency plan you're

4  referring to here?

5          A.    My contingency plan is to move clients away

6  from AHF into other providers.

7          Q.    Does that contingency plan include

8  providing sending them to other providers including CAN?

9          A.    CAN was one of the providers, yes.

10         Q.    But as of April 26th -- so as of April 26th

11  had you spoken to CAN about your contingency plan?

12         A.    No.

13         Q.    Had you spoken to anybody about your

14  contingency plan?

15         A.    My staff.

16         Q.    Who on your staff did you speak to?

17         A.    Jeffery and Bocky.

18         Q.    Anybody else?

19         A.    Maybe Gaynelle.

20         Q.    Anyone else you can think of?

21         A.    No.

22         Q.    So other than moving clients to CAN or

23  other providers, what else was entailed in this

24  contingency plan you're referring to here?

25         A.    Well, it would be finding additional case

Kurt Goodman Vol II
January 08, 2024                                160

 1   management, making hires if I needed to do that, or

 2   finding another agency.

 3        Q.    And include sending case management clients

 4   to OASIS' case managers?

 5        A.    Yes.

 6        Q.    At the time OASIS' case management caseload

 7   was lower than AHF's, correct?

 8        A.    I don't know.

 9        Q.    You don't know?  Were you aware that there

10   were case managers at OASIS that had case management

11   caseloads that were at 65 or lower around this time

12   period?

13        A.    Again, I don't see the monthly caseload

14   reports so no.

15        Q.    Would it be a cause for concern for you

16   that if the caseloads were down nearing 60?

17        A.    A cause for concern, no.

18        Q.    No?

19             MR. HARRELL:  Objection.  Was that a

20        question or just a comment?

21             MR. HIAASEN:  What did I say?

22             MR. HARRELL:  He said no, you said no,

23        sounded like no question mark, but I don't know

24        if it was --

25             MR. HIAASEN:  Okay.

```
 1                  MR. HARRELL:  -- that's why I objected.

 2                  MR. HIAASEN:  Okay.  I've made a mistake

 3         again, are we at 17 or 18?

 4                  THE WITNESS:  This is 16.  Oh, wait a

 5         minute.

 6                  MR. HARRELL:  17 is the next one.

 7                  MR. HIAASEN:  Okay, yeah, the inevitable,

 8         right?

 9                  (Plaintiff Exhibit Number 17 was marked

10         for identification.)

11             Q    (By Mr. Hiaasen) I'll show you what I marked

12     as Deposition Exhibit 17.  Is this an email to you from

13     Russell Walker responding to the email we just discussed

14     on April 26th.  Do you see that?

15         A.    I do.

16         Q.    Do you recall receiving this email?

17         A.    I don't.  Okay.

18         Q.    So after reading it do you recall receiving

19     it?

20         A.    No, I don't really recall this specific

21     email.

22         Q.    Is it possible you never read it?

23                  MR. HARRELL:  Object to the form.

24         A.    Sir, I just don't remember this specific

25     email.
```

Kurt Goodman Vol II
January 08, 2024                        162

1          Q     (By Mr. Hiaasen) Okay.  Well, you would

2    agree it appears to be in response to your email sent

3    April 26th at 1029?

4          A.    It looks like it was a reply to my email

5    reply to his, yes.

6          Q.    Okay.  And in this email on the second

7    paragraph you see where Mr. Walker says we're not

8    actively adding to the caseload.  Do you see that?

9          A.    Yes.

10          Q.    And again, he repeats so this is an interim

11    issue.  It's not something we're actively pursuing.  Do

12    you see that?

13          A.    I see what he says.

14          Q.    So I believe one of the issues you said you

15    had with AHF was they were continuing to add clients,

16    correct?

17          A.    Yes.

18          Q.    And from this email do you agree it appears

19    Mr. Walker is telling you we're not actively adding new

20    clients?

21          A.    I would agree that that's what he's saying

22    in this email.

23          Q.    He also says we will follow the rules.  Do

24    you see that?

25          A.    I do.

1          Q.     In the very last paragraph he says we're

2     following the guidelines per the contract.  Do you see

3     that?

4          A.     I see it.

5          Q.     And I believe you had in your letter of

6     April 19th, you had asked that AHF provide a written

7     response to your letter, correct?

8          A.     I believe that's correct, yes.

9          Q.     These emails from Mr. Walker, would they

10    constitute written responses for purposes of your

11    letter?

12         A.     Yes.

13         Q.     Okay.  So what was it about -- why after

14    receiving this email from Mr. Walker were you still

15    unsatisfied that AHF was -- intended to follow the

16    contract?

17              MR. HARRELL:  Object to the form.

18         Q    (By Mr. Hiaasen) You can go ahead and

19    answer.

20         A.     We are not actively adding to the caseload.

21    However, I was very clear that AHF will never turn a

22    patient away.  And yes, we are aiming to stay under the

23    caseload, but we cannot be held to patient's choice.

24              What he's telling me here is different than

25    what he's saying here a couple of sentences later.  They

Kurt Goodman Vol II
January 08, 2024                                    164

1   don't intend to follow the terms of the contract.

2            Correctly following the terms of the

3   contract, if you have your three case managers and they

4   each have 100 and another client comes in there and

5   needs case management, you send them to a case

6   management agency with availability.  That are the

7   guidelines in Area 100.  I understand that's not AHF's

8   business practice.

9        Q.    But again, if they had a fourth case

10  manager then they're well under the case management cap,

11  correct?

12            MR. HARRELL:  Object to the form.

13       A.    If there was a fourth case manager, they

14  would be.

15       Q    (By Mr. Hiaasen) And in the previous email

16  from Mr. Walker he informed you that their intent to

17  hire somebody else and -- correct?

18       A.    Yes.  And that would have taken care of one

19  issue.

20            Q.    And I believe your testimony was that -- is

21  that you were saying you had told them that you wouldn't

22  require them to get rid of clients.  So that when they

23  got someone onboard they would have all their clients

24  and they would be under the threshold, correct?

25       A.    I told them --

1              VIDEOGRAPHER:  Standby.  And we're on the

2       record at 3:06 p.m.

3           Q    (By Mr. Hiaasen) Mr. Goodman, earlier you

4    had testified about communications you had with someone

5    named Mattie at CAN.  Does the name Mattie Scott ring a

6    bell?

7           A.    That's correct, yes.

8           Q.    That's who you were speaking with?

9           A.    Yes.

10          Q.    Okay.  You had testified that CAN had --

11   CAN and OASIS had previously had a revenue sharing

12   agreement.  And I believe your testimony was that

13   revenue sharing agreement no longer exists, is that

14   correct?

15          A.    Correct.

16          Q.    Other than the rent payments for the Fort

17   Walton Beach location, does CAN or has CAN provided any

18   revenue to OASIS since you've been Executive Director of

19   Oasis?

20          A.    Yes.

21          Q.    What is that revenue?

22          A.    Sponsorships for events like our Man Reach

23   Program or Woman Reach and our Positive Living Program.

24   They have also sponsored a Red Party, things like that.

25          Q.    Those are in response to -- are those

Kurt Goodman Vol II
January 08, 2024                              193

1  fundraiser events --

2         A.    Yes.

3         Q.    -- that OASIS --

4         A.    Well, no.  The Positive Living Programs are

5  programs that we have at OASIS for people living with

6  HIV.  The Man and Woman Reach events are retreats that

7  we take people on.

8               And then the Positive Living conference is

9  the only conference in the world for people living with

10 HIV that we put on every year.

11        Q.    And CAN provides --

12        A.    Sponsorship.

13        Q.    -- sponsorship.  So is that kind of like in

14 the form of donation?

15        A.    Yes.

16        Q.    Okay.  So that sponsorship money is not

17 tied to any revenue generation from clientele or

18 anything like that?

19        A.    Not at all.

20        Q.    Okay.  Is there a fixed amount that they

21 give every year, or does it change year to year?

22        A.    They have a grant process.  You have to

23 write -- you know, you apply to them and say, hey, you

24 know, we're putting on this event, would you be

25 interested in being a sponsor of this event?  So it's --

Kurt Goodman Vol II
January 08, 2024                                    194

```
 1           Q.    So every year you request a sponsorship?

 2           A.    Yeah.

 3           Q.    Independently?

 4           A.    Yes.

 5           Q.    It's not an ongoing contractual agreement?

 6           A.    No, it's independent every year, yeah.

 7           Q.    Okay.  Do others provide sponsorships in

 8    the community --

 9           A.    Oh, yes.

10           Q.    -- besides CAN?

11           A.    Yes.

12           Q.    Okay.  Do you ever approach AHF for

13    sponsorship in these areas?

14           A.    AHF used to sponsor all of those programs.

15           Q.    Okay.  They don't anymore?

16           A.    No.

17           Q.    Is that since the contract was terminated?

18           A.    No.  Since before the contract was

19    terminated.

20           Q.    When did they stop sponsoring these events,

21    if you recall?

22           A.    I'm trying to remember the year.  It was, I

23    want to say, 2018 or 2019.

24           Q.    Okay.  So before you were --

25           A.    They stopped sponsoring the events before I
```