```
 1            IN THE UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF FLORIDA

 3                  TALLAHASSEE DIVISION

 4   AIDS HEALTHCARE,

 5   FOUNDATION, INC.,

 6        Plaintiff,    CASE NO.: 4:23-cv-230-MW/MAF

 7   vs.

 8   OKALOOSA AIDS SUPPORT AND,

 9   INFORMATIONAL SERVICES, INC.,

10   a/k/a "OASIS," et al,

11        Defendants.

12   _____/

13         VIDEOCONFERENCE DEPOSITION OF

14         DONNA STIDHAM (VOLUME II OF II)

15         Taken on behalf of the Plaintiff

16   DATE TAKEN:        Tuesday, January 30, 2024

17   TIME:              10:02 a.m. to 12:40 p.m.

18   (All parties, counsel, the witness being deposed, and

19   the court reporter all appeared remotely via Zoom.)

20

21        Examination of the Witness reported by:

22      Christina M. Esposito, Florida Professional

23   Reporter, Notary Public, State of Florida at Large

24              ANCHOR COURT REPORTING
                229 South Baylen Street
25              Pensacola, Florida 32502
```

1    this case?

2           A.    Yes.

3           Q.    Okay.  And it looks like the majority of the

4    proposed expert testimony is in the second paragraph

5    there which begins, "the facts and opinions to which

6    the witness is expected to testify."  Is that correct?

7           A.    Well, the document in total is what I

8    intended to testify, should you be asking questions

9    with regard to the subject paragraphs.

10          Q.    Okay.  Let's start first with the second

11   paragraph.  This is a summary of potential testimony.

12   I want to drill down a little on that.

13                It appears that the first, kind of,

14   indication of what your testimony will be is that, "The

15   case management case load cap imposed by OASIS upon AHF

16   is not required by the federal rules and regulations

17   governing the Ryan White program or by the Florida

18   Department of Health."  Is that correct?

19          A.    That's correct.

20          Q.    Okay.  What is the basis for your opinion

21   that is the fact?

22          A.    The HIV/AIDS bureau, the Ryan White Case

23   Management Guidelines, the Florida state specific part

24   B. guidelines, the Florida contract with OASIS that

25   states minimums.  It does not state any maximums.  None

1   of those documents have maximums.  They do have

2   minimums, and that's what I base my opinion on.

3       Q.    Okay.  And those actual documents, there are

4   minimums stated, but they are silent as to any sort of

5   case load cap or maximum.  Is that correct?

6       A.    There is no case load cap mentioned in any

7   of them.

8       Q.    Right.  And there's -- along the same lines,

9   there is no discussion about a prohibition against case

10  load caps, is there?

11      A.    There is a prohibition in the contract from

12  the State of Florida to OASIS that it should not change

13  its contract without written permission from the State.

14  And the State's contract does not have a maximum.

15      Q.    Ms. Stidham, this will go a lot quicker if

16  you answer the questions I ask.

17           My question is:  Is there any prohibition

18  specifically precluding the -- a case load cap in any

19  of these documents?  And if so, tell me exactly where

20  it is located?

21           MR. HIAASEN:  Objection: asked and

22       answered.

23           MR. HARRELL:  She didn't answer the

24       question.  She changed the answer to the question.

25       Go ahead and answer, please.

```
1              MR. HIAASEN:  Excuse me, just for the
2         record, she answered the question several times on
3         Friday.  This is covering the same ground as was
4         discussed on Friday.
5    BY MR. HARRELL:
6         Q.    Go ahead, Ms. Stidham.
7         A.    There is no case load caps mentioned in any
8    of the documents.
9         Q.    Thank you.  Are you aware that the State of
10   Florida grants OASIS, as lead agency, the ability to
11   set protocols in order to effectuate its services?
12             MR. HIAASEN:  Object to the form.
13             MR. HARRELL:  What is the objection?
14             MR. HIAASEN:  Assumes facts not in
15        evidence.
16             MR. HARRELL:  Okay.
17   BY MR. HARRELL:
18        Q.    Go ahead.  You can answer.
19        A.    I am aware that the State of Florida grants
20   OASIS certain contractual abilities.  Changing the
21   standards of the contract is not one of them.
22        Q.    Okay.  Have you been educated in any way in
23   a legal capacity?  Do you --
24        A.    Pardon?
25        Q.    In other words, do you have any legal
```

1    education background?

2        A.    No.

3        Q.    You mentioned -- well, I'm sorry.  Exhibit 3

4    mentions the witness, being you, "will further testify

5    that the one hundred client case management cap imposed

6    by OASIS on Area One providers is an anomaly in the

7    Ryan White program nationally."  What is your source of

8    information there?

9        A.    I have over 55 Ryan White case management

10   contracts with various states, counties, P.G.A.s,

11   E.M.A.S.s, individual organizations, and not one of

12   them has a stated cap.

13            The Ryan White standards have no stated

14   caps, which govern all the different jurisdictions

15   nationwide.

16       Q.    Again, similarly the Ryan White guidelines

17   provide no prohibition.  Correct?

18       A.    Could you repeat that?  You are echoing.

19       Q.    There are no prohibitions in the guidelines

20   on a Ryan White cap.  Correct?

21       A.    The guidelines and the rules from the

22   HIV/AIDS bureau do not mention caps.

23       Q.    In any of your other 55 contracts, is there

24   a prohibition on the case load caps?

25       A.    None of the contracts state case load caps.

1    They state minimums only.

2         Q.    Ryan White case managers -- I'm going back.

3    I apologize.   Going back to Exhibit 3, the next clause

4    states, "The Ryan White case managers commonly carry

5    case loads in excess of one hundred cases, and that

6    such case loads do not threaten or implicate quality of

7    services or care."   What is the source of information

8    from which you develop that opinion?

9         A.    You are reading from this document?

10        Q.    Yes, ma'am.   It begins the second

11   paragraph -- if you go down five lines, at a comma

12   after "nationally," it starts that clause I just read

13   to you.

14        A.    And the question is?

15        Q.    The question is, what is the -- to the

16   extent you are providing an expert opinion that this is

17   the case, what is the source of the information you

18   relied upon in developing this opinion?

19        A.    The source of the information is my

20   experience with, in excess of 55 active contracts, and

21   attending Ryan White case management meetings,

22   listening to multiple jurisdictions, and multiple

23   reports of case load rosters.

24             And many jurisdictions, in our experience,

25   have over one hundred case load, and have no difficulty

1    giving Ryan White case management services.

2        Q.    Okay.  In developing this specific opinion,

3    did you review any specific documents or data, or are

4    you just relying on your own generalized experience?

5        A.    It is generalized experience of reviewing

6    reports HRSA themselves, the HIV/AIDS bureau, my own

7    programs in 55 different jurisdictions, and all the

8    data associated with that.

9        Q.    Okay.  And you say it is, generally, that

10   your knowledge of that -- specifically did you

11   review -- prior to coming to this specific opinion, did

12   you review any specific data that I could go pull and

13   rely upon to know exactly what you were relying upon?

14       A.    I reviewed the data I just stated in my

15   different programs, and the HRSA HIV/AIDS bureau

16   meetings.

17       Q.    How did you review the meetings?

18       A.    Because I attend them.

19       Q.    Okay.  That's kind of what I'm getting at.

20   I think we are two ships passing in the night.  Were

21   there any documents that you have specifically reviewed

22   that you can tell me that I can then go ask for, or

23   pull, that would then give me the information that you

24   say you relied upon, or is this more of a generalized

25   experience that you developed over time?

1        A.    It is my generalized experience developed

2   over 35 years.

3        Q.    Okay.  Moving on to the next sentence.  It

4   starts, "Ms. Stidham will further testify that case

5   management case loads should be governed, in part, by

6   the level of medical care and treatment or services

7   required by the clients, and that OASIS' 100 case

8   management cap does not provide adequate consideration

9   to these factors."

10            What did you rely upon in developing that

11  opinion?

12       A.    Over 35 years of experience.  To tag a

13  number is inadequate.  Patients are not numbers.  A

14  roster has different needs per each individual on the

15  cap -- on a case management roster.

16       Q.    So --

17       A.    It is not just a number.  It is the acuity

18  and the need.  Some patients have higher needs, and

19  other patients have minimal needs, so a number is not

20  relevant.

21       Q.    Again, your basis for that is your

22  experience.  You didn't look at any sort of specific

23  document or other data or information specifically to

24  come to that conclusion.  That is based off your 35

25  years of experience alone?

1    A.    Yes.

2    Q.    Okay.  "Ms. Stidham will further testify

3    that OASIS' case management cap is an arbitrary and

4    unreasonable condition placed on AHF."  Again, what do

5    you mean by arbitrary and unreasonable condition?

6    A.    The number is arbitrary.  There is no data.

7    There is nothing that supports a number of one hundred.

8    Even in professional associations -- the case

9    management association clearly states there is no

10   number.

11          It is based on patient needs.  Each

12   situation is different.  One hundred is just an

13   arbitrary number.  There is no guarantee that is low

14   enough or high enough.  And there is nothing that was

15   offered to say why the one hundred was chosen.

16   Q.    Have you ever been to Area One?

17   A.    Yes.

18   Q.    Did you review any information about Area

19   One in coming to this conclusion that the one hundred

20   case load cap is arbitrary, and I mean specifically

21   related to Area One?

22   A.    No.

23   Q.    Okay.  Are you familiar with the study that

24   was performed about the provision of Ryan White

25   services in Area One dating back to 2019?

1   problems, so there is no reason for a case load cap.

2   What do you mean by that?

3       A.   There was an audit done, an official audit

4   with no findings.

5       Q.   Okay.  Are you aware whether there were any

6   concerns about documentation between OASIS and AHF, and

7   the timeframe leading up to the termination of the

8   contract?

9       A.   I am aware of a supposed review that was

10  done, that had some concerns stated, but when we asked

11  for the documentation and the patient information so we

12  could validate and correct, we were denied multiple

13  times.

14           And, to date, we have yet to get the list of

15  patients that were looked at, so we could validate what

16  was stated by OASIS was actually factually true.

17      Q.   Let me ask you this:  For the Ryan White

18  case management, it is important to have appropriate

19  documentation.  Correct?

20      A.   Documentation is required.

21      Q.   Okay.  And a failure to maintain appropriate

22  documentation can result in issues with whether someone

23  is appropriately covered for the services required.

24  Correct?

25      A.   Issues of documentation -- could you repeat

1      A.    That would be the contract manager.

2      Q.    And who is that?

3      A.    Off the top of my head, I do not remember

4   her name.

5      Q.    Is it Dawn Averill?

6      A.    No.

7      Q.    Does the contract manager fall within your

8   chain of command?

9      A.    No.

10     Q.    Do you have any reason to believe, as we sit

11  here today, that OASIS has not paid AHF in full for all

12  services provided pursuant to the subcontract that you

13  just reviewed?

14     A.    I do not know.

15     Q.    Fair enough.  Do you recall providing an

16  affidavit in support of the motion for preliminary

17  injunction filed in this case?

18     A.    Yes.

19     Q.    In your affidavit, you state that AHF hired

20  additional case managers at its own expense to insure

21  that it satisfied the arbitrary case load imposed by

22  OASIS.  Who did you hire?  Who did AHF hire?

23     A.    I would have to look at the staffing to give

24  you the information, the name.  I don't recall the name

25  off the top of my head.

1    Q.    Do you know whether this person was hired

2  before the end of May of 2023?

3    A.    I believe so.

4    Q.    Okay.  And do you know if that person had

5  been hired -- I'm sorry.  Do you know if that person

6  had begun working before the end of May of 2023?

7    A.    I believe so.

8    Q.    Hold on one second.  Ms. Stidham, do you see

9  the document?  I believe this was previously marked as

10  Exhibit 2.  Do you see this document?

11    A.    Yes.

12    Q.    I think we established on Friday that the

13  three case managers listed on this report, S.B., would

14  be Sam Burgess who is the lead case manager.  You have

15  an M.B. and a B.P.  On Friday you couldn't recall the

16  names of those people.  Do you recall their names

17  today?

18    A.    No.

19    Q.    It looks like as of February there was a

20  reporting of three case managers.  Correct?

21    A.    Correct.

22    Q.    And then as you look down on this document,

23  the second page shows March.  Again, it is only

24  reporting, S.B., M.B., and B.P.  Correct?

25    A.    Correct.

1   Q.   Do you know if today, or ever since the day

2   the contract was terminated, whether AHF continued to

3   provide services, case management services, to patients

4   who they had previously treated, or previously provided

5   case management services for, prior to the termination

6   of that contract?

7        MR. HARRELL:  Object to the form.

8   **BY MR. HIAASEN:**

9   Q.   Do you understand the question?

10  A.   Could you repeat it, please?

11  Q.   Sure.  Do you know if AHF continued to

12  provide services to clients -- case management services

13  to clients who had been receiving treatment, or case

14  management under the Ryan White program, after the

15  termination of the contract with OASIS?

16  A.   Yes.

17  Q.   Now, I think you testified today that -- you

18  made a reference to 55 Ryan White contracts that AHF

19  has around the United States.  Do you recall that?

20  A.   Yes.

21  Q.   And I would just like to clarify.  Is that

22  the number of current Ryan White case management

23  contracts that AHF has?

24  A.   Yes, at least 55.

25  Q.   Do you or can you testify to an estimate of

1    how many Ryan White contracts AHF has had historically

2    since you have been the head of case management?

3         A.    Hundreds.

4         Q.    And, again, those are not exclusive to

5    Florida.  Those are all over the United States?

6         A.    All over the United States, yes.

7         Q.    And, historically, among all those hundreds

8    of contracts, have you ever encountered a contract that

9    capped the number of clients that a case manager could

10   provide services for?

11        A.    No caps, just minimums.

12        Q.    And just to be clear, you have never

13   encountered in any of those contracts under the Ryan

14   White program a contract that specified that the number

15   of clients per case manager could not exceed one

16   hundred?

17        A.    Not that I ever recall, no.

18        Q.    So in your position currently, it is as the

19   chief of managed care.  Is that correct?

20        A.    Correct.

21        Q.    And how many -- if you can say -- case

22   managers does AHF employ nationwide that fall under

23   your oversight as the chief of managed care?

24        A.    Around two hundred.

25        Q.    And are all of those two hundred case

1    managers case managers who perform services under the

2    Ryan White program?

3         A.    No.

4         Q.    Can you state or estimate how many of those

5    case managers work under the Ryan White program?

6         A.    Probably at least three quarters of them.

7         Q.    So that would be around one fifty?

8         A.    One fifty or one sixty, or so, yes.

9         Q.    Now, as part of your role with AHF, do you

10   receive or review internal data regarding the case

11   loads carried by AHF's case managers?

12        A.    Yes.

13        Q.    And how often do you receive such data?

14        A.    Monthly and quarterly.

15        Q.    And if they were -- do you also, as part of

16   your duties, receive audits performed of Ryan White

17   case managers, both in Florida and other states?

18        A.    Yes.

19        Q.    So if there was an audit performed by a

20   state government or local government or federal

21   government that identified issues with the Ryan White

22   case management programs with AHF, you would be aware

23   of them.  Is that fair to say?

24        A.    Yes.

25        Q.    And in your experience as the chief of

1    A.    I do know that there were complaints that

2    there were glitches in the system, specifically at this

3    point in time I don't recall all of the complaints.

4    But people would put data in, and they would go back in

5    and it wouldn't be there, so there were complaints of

6    that nature.

7    **BY MR. HIAASEN:**

8        Q.    How were those complaints brought to your

9    attention?

10       A.    The staff reported it, and I believe they

11   reported it to the HAP-C, which is the HIV area

12   coordinator for the system.

13       Q.    When you say the staff reported, do you

14   recall who specifically on the staff reported that to

15   you?

16       A.    I believe it was Jesse or Dawn.

17       Q.    Now, Mr. Harrell had asked you about a

18   document -- I believe it was referred to as the needs

19   assessment.   I think you referred to it earlier today

20   as being published in 2019 -- the needs assessment for

21   Florida.  Do you recall Mr. Harrell asking you about

22   that?

23       A.    Yes.

24       Q.    And I believe you testified you didn't

25   believe that was -- you didn't rely on that as a basis

1  for formulating your opinions regarding the necessity

2  of a one hundred person case management cap.  Correct?

3       A.   Correct.

4       Q.   Can you explain why you did not believe that

5  this document was material to your opinion?

6       A.   It was a small sample size.  It was

7  anecdotal in nature and not characteristic of programs

8  nationwide.

9       Q.   Do you recall if there was any data in that

10  report that supported the notion that the quality of

11  care diminishes if the number of case managers is over

12  one hundred?

13            MR. HARRELL:  Object to form.

14  **BY MR. HIAASEN:**

15       Q.   You can answer.

16       A.   I do not recall any data in that report that

17  supported that other than what it stated.

18       Q.   What is your understanding of what it did

19  state?

20       A.   That they interviewed people, and took

21  anecdotal data from them, but it was not measured over

22  time.  It was not trended over time.  It was not

23  demonstrated that there was any patient outcome impact.

24       Q.   And when you said they interviewed people,

25  do you recall who was in the interview?

```
 1          A.     Case managers.  Case managers.  Sorry.

 2          Q.     No problem.  I believe you testified that

 3   AHF was still providing services -- case management

 4   services to clients.  Correct?

 5          A.     Correct.

 6          Q.     And the case managers who were employed by

 7   AHF in Area One at the time of the OASIS contract --

 8   Sam, and I think there were a couple of folks whose

 9   names you said you couldn't recall -- to your

10   knowledge, are those same case managers still employed

11   by AHF today?

12          A.     Yes.

13          Q.     And are those still the same case managers

14   who are providing the services to, in some cases, the

15   same clients they have been previously serving when

16   they were under contract with OASIS?

17          A.     Yes.

18          MR. HIAASEN:  Okay.  I have no further

19      services.

20          MR. HARRELL:  Okay.  I want to ask a couple

21      of follow-ups.

22

23

24

25
```