**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**CASE NO: 4:23-cv-00230-MW/MAF**

AIDS HEALTHCARE FOUNDATION, INC.

      Plaintiff,

vs.

OKALOOSA AIDS SUPPORT AND
INFORMATIONAL SERVICES, INC.,
a/k/a "OASIS," and the FLORIDA
DEPARTMENT OF HEALTH,

      Defendants.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff AIDS Healthcare Foundation, Inc. ("AHF"), by and through its counsel, hereby files this Response in Opposition to Defendant's Motion for Summary Judgment [D.E. 65].  In support, Plaintiff states as follows:

**STATEMENT OF MATERIAL FACTS**

AHF is a nonprofit corporation of global scope, providing HIV/AIDS medical treatment, counseling, and preventive programs to more than 1.7 million people in 15 states and territories in the U.S. and 45 countries around the world.  ECF No. 28-20 at 1.  AHF acts as a "safety net" provider for those living with HIV/AIDS, including vulnerable, low-income clients.  ECF No. 29 at 35.  In keeping with its mission, AHF provides services to clients regardless of their ability to pay.  *Id.*

As part of this mission, AHF provides outpatient medical care and medical case-management services to tens of thousands of low-income clients around the United States through

1

programs pursuant to the Ryan White Care Act, which provides federal funding, in part, to state and local governments for HIV/AIDS programs for low-income, uninsured, and underinsured people living with or at risk of contracting HIV/AIDS ("Ryan White Program").  ECF No. 28-20 at 1-2.

In Florida, the Florida Department of Health ("DOH") administers Part B of the Ryan White Program.  *Id.* at 2.  In much of Florida, AHF and other Ryan White Program service providers contract directly with local health departments (arms of the DOH) to provide services.  An exception is Northwest Florida—the DOH's "Area 1"—where the DOH contracts with a "lead agency" which then subcontracts with other Area 1 service providers.  *Id.*

AHF provided case-management and outpatient medical services in Northwest Florida under the Ryan White Program beginning in 2014 without incident.  *Id.*  Beginning in 2020, AHF subcontracted through Defendant Okaloosa AIDS Support and Informational Services, Inc. ("OASIS") after it was selected as DOH's lead agency for Ryan White services.  *See* ECF No. 28-7.  AHF maintained three full-time case managers funded in part through the Ryan White program.  ECF No. 29 at 33.

Under the terms of its contract with the DOH, OASIS is required to contract with subcontractors such as AHF on terms consistent with those contained in OASIS's agreement with the State, and any such terms must be approved by the DOH.  ECF No. 28-1 at 6.  OASIS's contract with the DOH requires that any subcontracts entered into by OASIS pursuant to that agreement "shall incorporate the terms of the Department's Standard Contract."  *Id.*

OASIS's contract with DOH states that, when providing case management services, each full-time case manager must "maintain a __**minimum**__ case load of 60 Eligible Clients." *Id.* at 16 (emphasis added).  OASIS's contract with DOH does __**not**__ impose a maximum cap on the number

of clients that may be maintained by Area 1 case managers.  *Id.*  Moreover, neither Florida nor the federal Department of Health and Human Services require caseload caps for Ryan White case managers.  *See* ECF No. 29 (July 13, 2023, Preliminary Injunction Hr'g Tr.) at 37, 43; *see also* ECF. No. 68-3 at 70-71.

Nevertheless, OASIS imposed an additional restriction on AHF and required that its case managers cap their caseloads at 100 clients per case manager.

OASIS first included this provision in its 2020-21 contract with AHF.  ECF No. 28-7. While this contract required full-time case managers to maintain a maximum caseload of 100 clients, it further stated that case managers could exceed this cap with written permission from OASIS.  *Id.* at 24.  The contract included a "financial consequences" provision stating that $100 would be deducted from the monthly payment to AHF for every patient over the caseload cap.  *Id.* at 25.

AHF objected at the time, as caseload caps are contrary to patient choice and continuity of care, which are essential to ensure that patients maintain their course of treatment.  *See* ECF Nos. 29 at 38-42; 28-8.  Indeed, throughout the country, AHF's Ryan White case managers commonly carry caseloads of over 100 clients.  ECF Nos. 29 at 38-42; 68-2 at 45-46.  The principal factor in determining a case manager's appropriate caseload is the acuity of the patients being served.  *Id.*; ECF No. 68-3 at 75-77.

AHF provides Ryan White services in at least 55 jurisdictions.  ECF No. 68-3 at 73-75. No other jurisdiction imposes such caseload caps on AHF. ECF Nos. 68-2 at 45-46; 68-3 at 103-04. Nor are caseload caps required by the DOH or the federal Department of Health and Human Services.  ECF Nos. 29 at 43; 68-3 at 75-77.  *See also* ECF No. 28-1.  Significantly, the DOH never approved OASIS's caseload caps.  ECF No. 29 at 130.

During the 2020-21 contract period, OASIS took no action to impose or enforce the 100-client cap on AHF.  *Id.* at 42-43.  OASIS's subsequent contracts with AHF in 2021-22 and 2022-23 did not contain any caseload maximum caps.  *Id.* at 43.  *See also* ECF No. 28-2.

In September 2022, OASIS's executive director, Kurt Goodman, instructed AHF and other Ryan White subcontractors to cap their case management caseloads at 100 and refer any excess clients to other agencies that had not reached the caseload cap, citing OASIS "policy."  *See* ECF No. 68-7.  While OASIS claimed at the time that the 100-client cap was contained in its Area 1 Ryan White Support Services Guidelines, *see* ECF No. 28-19 at 4, this provision was not included in previous versions of the Guidelines provided to AHF or other providers.  *See* ECF Nos. 28-24 & 28-25.

As a basis for this caseload cap, OASIS claims it relied on a "needs assessment" report prepared by the Northwest Florida AIDS Consortium in 2017-18, which surveyed case managers to record their views on their optimal caseloads.  *See* ECF No. 64-1 at 3-4.  However, this review was simply "anecdotal in nature" and fixed in time, and it contained no data demonstrating that caseloads over 100 clients per case manager had any effect on patient health or outcomes.  ECF No. 68-3 at 114-15.  To the contrary, AHF's case managers around the country commonly carry caseloads above 100 clients without issue.  ECF Nos. 68-2 at 45-47; 29 at 39-40.  For these reasons, among others, Donna Stidham, AHF's Chief of Managed Care and its designated expert, concluded that OASIS's caseload caps were arbitrary and unreasonable.  ECF No. 68-3 at 77 ("The number is arbitrary.  There is no data.  There is nothing that supports a number of one hundred"); *see also* ECF No. 29 at 39.

Notably, Ascension Sacred Heart ("Sacred Heart"), another Ryan White case-management provider that contracted with OASIS, also had caseloads that exceeded 100 clients per case

manager, yet OASIS never threatened to terminate its contract, or otherwise penalized that agency. ECF Nos. 68-25; 68-1 at 88-90.

At the time – and throughout its tenure as the lead agency – OASIS was also providing case management services in competition with AHF and its other subcontractors.  *See* ECF No. 29 at 146-47.  OASIS specifically instructed AHF to refer any clients exceeding the 100-client cap to OASIS.  *Id.* at 58.

In October 2022, OASIS performed an audit of both AHF's case-management files and its handling of Ryan White client eligibility review process, as required by the DOH.  ECF No. 68-8. OASIS's review concluded that AHF's files "looked very good," and its "[d]ocumented case management was appropriate and timely." *Id.*  The only issue OASIS raised at the time was the apparent duplication of documentation in some files.  *Id.*

OASIS did not raise the caseload issue with AHF again until March 2023, just as AHF's subcontract with OASIS was scheduled for renewal.  *See* ECF No. 28-13.  In a March 8 letter, OASIS informed AHF that its new proposed subcontract for 2023-24 would include a provision capping caseloads at 100 per case manager "with consequences for failing to do so." *Id.* at 2.  At that time, OASIS was already planning to terminate AHF's contract (before it was presented to AHF).  ECF No. 29 at 126-27.

AHF again objected to the caseload limits, on the grounds that caps on services are "against the mission of the Foundation and our core values." ECF No. 28-14 at 1.  AHF also noted that in some cases OASIS had terminated some clients for behavior and other reasons who were then serviced by AHF.  *Id.* Was AHF to turn those clients back to OASIS after OASIS had terminated them? *Id.*

In a moment of frustration, one AHF employee complained in an email that the continued focus on caseload caps had become "tedious."  *Id.* at 2.  This irked Mr. Goodman, who already believed (incorrectly) that AHF officials had "gone to the State over my head numerous times about all kinds of issues." ECF No. 29 at 152 (complaining that "[t]hey have called me names in email"); ECF No. 28-15 at 2 (accusing AHF of "petulant behavior").  However, despite Mr. Goodman's irritation, OASIS presented, and ultimately agreed to, a renewed contract with AHF.

Meanwhile, Goodman and OASIS were being lobbied to turn over case-management services to a separate provider, CAN Community Health ("CAN").  ECF No. 68-1 at 45-47. OASIS and CAN already had a close relationship: CAN rented space from OASIS for its clinic in Fort Walton Beach (at below-market rates, *see* ECF No. 68-9), CAN donated to OASIS programs (ECF No. 68-10), and they once participated together in a profit-sharing agreement.  ECF No. 68-1 at 19-24, 192-94.  In March 2023, CAN was also lobbying the DOH for additional Ryan White clients, including case-management clients.  ECF Nos. 68-11; 68-4 at 22.  At the time, however, CAN did not provide case management services through the Ryan White program.  *Id.*

Under the new contract presented by OASIS for the 2023-24 contract year, AHF was to be reimbursed through the Ryan White program a total of $115,000 for providing primary medical care to clients, $5,000 for specialty care, and $120,000 for case management services.  ECF No. 28-3 at 1.  The contract specified that AHF case managers were to "maintain a minimum caseload of 60 and a maximum caseload of 100 eligible clients per full-time equivalent (FTE) Case Manager." *Id.* at 5.  Further, maintaining caseloads between 60 and 100 clients per case manager was among the "deliverables" identified in the agreement.  *Id.* at 6.  However, unlike the 2020-21 contract, this agreement did not contain a provision allowing AHF to exceed the caseload cap with OASIS's approval.  *Id.*

Significantly, the contract specified certain "financial consequences" that would result if AHF failed to provide these "deliverables," including satisfaction of the case-management cap. *Id.* Specifically, the contract stated: "Failure to maintain a case manager's caseload as specified will result in a $100.00 reduction in that month's invoice amount for each client a case manager maintains outside caseload guidelines." *Id.* at 7.

On April 18, 2023, AHF conveyed the executed 2023-24 agreement to Mr. Goodman and OASIS. ECF No. 68-12. In the email transmitting the signed contract, AHF reiterated its opposition to the caseload cap, as it was "against AHF standards to turn away clients or cap services." *Id.* However, AHF recognized that the caseload cap was a term of the contract and, pursuant to the contract terms, "[i]n the event we do exceed 100 clients per FTE, we will have to pay the financial penalty." *Id.*

**Less than 24 hours later**, Mr. Goodman and OASIS declared that AHF was in breach of the contract that had been delivered to OASIS just the day before. *See* ECF No. 28-16. In his April 19 letter, Mr. Goodman complained that AHF had added new clients in excess of 100 clients per case manager in March and April 2023 – before the contract had been executed. *Id.* Mr. Goodman accused AHF of breaching the contract it just executed and threatened that "the next communication from me will be a notice of termination." *Id.* Mr. Goodman further stated that he had "developed a contingency plan and have initiated steps to ensure that we are prepared in case it becomes necessary." *Id.*

Mr. Goodman also claimed that he launched a "review" of AHF's client files to "see for myself" whether AHF could effectively manage its caseloads. *Id.* In fact, this "review" (which, according to Mr. Goodman, was never reduced to writing) was a self-fulfilling prophecy: Mr. Goodman simply requested that his staff identify eight "examples" of allegedly improper

paperwork – nothing more.  ECF No. 68-1 at 147, 154.  Tellingly, Mr. Goodman's letter did not provide any specific, identifiable information regarding the eight examples referenced in his letter, and OASIS refused to provide this information when AHF asked for it.[1]  ECF Nos. 68-12; 68-15; 29 at 119-20; 68-3 at 79.

Around that time, OASIS and its subcontractors – including AHF and Sacred Heart – were experiencing "urgent" and "widespread" problems with the DOH's platform for managing and uploading documents related to Ryan White clients and case management.  ECF No. 68-13.  OASIS complained to the DOH that the providers (including AHF) were "plagued by the loss of user sign-in information" and were "very concerned with the very real possibility we are reporting data to HRSA [Health Resources and Services Administration] that we all know could be inaccurate." *Id.*

On April 25, 2023, following a phone call with Mr. Goodman, AHF's Deputy Bureau Chief, Russell Walker, wrote an email to Mr. Goodman to "inform him of our plan to ensure we are playing [by] the contract we have signed," and confirming that AHF had funded an additional case-manager position to take over some client files and allow AHF to meet the 100-client caseload limit.  ECF No. 28-17.  *See also* ECF Nos. 29 at 61-62; 68-27.  At deposition, Mr. Goodman conceded that, with an additional case manager, AHF would satisfy the contractual caseload cap.  ECF No. 68-1 at 164.

In his April 25 email, Walker further stated that, if AHF exceeded the caseload limit in the interim, AHF would pay any financial penalties pursuant to the "financial consequences" provision of the newly executed contract.  ECF No. 28-17.  As Mr. Walker stated: "we will pay this penalty until we get the position hired and case load spread across the team to ensure we fall below the

---

[1] OASIS did not produce any written documentation of this "review" in discovery, nor any "audit."

limit." *Id.* at 1. As Dawn Averill, AHF regional director for the Southeast, testified at the preliminary injunction hearing, AHF understood that violation of the caseload caps would result in financial penalties, not termination of the contract, because "that's what it said." ECF No. 29 at 60-61.

The next day, Mr. Goodman stated in response to Mr. Walker's email that he "agreed not to take any further action to allow you time to hire a part-time person as long as you were not continuing to add to the caseload in the meantime." ECF No. 28-18.  Mr. Goodman again threatened to terminate the contract and reiterated that he had a "contingency plan in place if I'm forced to make a change." *Id.*  Mr. Goodman also falsely claimed that OASIS's "audit continues [and] we are finding a significant amount of additional issues."  *Id.*  However, OASIS produced no evidence of this purported "audit" and they never identified any other documentation problems beyond the eight purported instances referenced (without identifying detail) in Mr. Goodman's April 19 letter.  ECF No. 68-1 at 153-56, 158, 167.

Mr. Goodman ended his April 26 email by stating: "I need written confirmation that AHF is going to operate within the established Area 1 guidelines."  ECF No. 28-18.

Just a few hours later, Mr. Walker ***provided the very written confirmation Mr. Goodman demanded***.  Mr. Walker confirmed in writing that AHF was "not actively adding to the caseload" and was "aiming to stay under the caseload," and confirmed that "we will follow the rules and penalties set forth in the contract." ECF No. 68-15.  Mr. Walker also asked again for specific information regarding OASIS's alleged audit and promised to investigate any specific issues or problems identified in the audit.  *Id.*  However, no "audit" or additional information was provided to AHF.

OASIS never specifically responded to Mr. Walker's April 26 correspondence. At deposition, Mr. Goodman testified that he did not recall receiving it.  ECF No. 68-1 at 161-64.

Instead, on May 1, Mr. Goodman sent a termination notice to AHF on behalf of OASIS, effective June 1 – and canceling both the case management *and* ambulatory medical services portions of the agreement.  ECF No. 28-4.  In the letter, Mr. Goodman again asserted that "AHF has refused to adhere to the service guidelines" and alleged that AHF "continued to add new clients into their case management program" – with no supporting evidence, and despite Mr. Walker's express statements to the contrary.[2]  *Id.*  Mr. Goodman further asserted that "AHF has specifically advised that they will not adhere [to the contract] moving forward" – which is precisely the *opposite* of what Mr. Walker advised in his emails on April 25 and 26.  *Id.*; *see also* ECF Nos. 28-17; 68-15.

The only basis provided for AHF's termination was its alleged refusal to follow the contract terms related to caseload caps for case managers.  ECF No. 28-4.  OASIS did not find that AHF breached any aspect of the contract related to ambulatory services; in fact, Mr. Goodman later testified that the medical care AHF provided to its clients was "very good." ECF No. 29 at 167-69.

At deposition, Mr. Goodman testified that he did not discuss his plans to terminate AHF with anyone at CAN prior to delivering the May 1 termination notice.  ECF No. 68-1 at 159-61.  This was untrue: In fact, Mr. Goodman had shared his plans to terminate AHF's contract with Susan Skinner, CAN's contracts manager, as early as March 2023 – before the 2023-24 contract

---

[2] At the preliminary injunction hearing, Dawn Averill of AHF testified that any new clients that AHF accepted during March-April 2023 were clients that OASIS had *kicked out* – and therefore AHF could not refer those cases back to OASIS.  ECF No. 29 at 107.

between OASIS and AHF had been executed, and before the so-called "audit" of AHF's work. ECF No. 68-4 at 23-27.

Indeed, Mr. Goodman sent a text message to Ms. Skinner on the morning of May 1 informing her of his intent to terminate AHF's contract – before notifying AHF. *See* ECF No. 68-16. Mr. Goodman also spoke that day with Max Wilson, CAN's senior vice president for governmental affairs, who encouraged him to "be strong." ECF No. 68-17.

Mr. Goodman also spoke with Maurice Moody of the DOH and stated that OASIS had "already made arrangements with CAN for them to begin providing ambulatory [medical] services."[3] ECF No. 68-19. At the time, CAN had few – perhaps as few as "zero" – clients receiving ambulatory medical services through the Ryan White program.[4] ECF No. 68-5 at 54.

According to Mr. Moody, Mr. Goodman told him that OASIS had "found quite a few violations that AHF has not begun to correct." ECF No. 68-19. In fact, Jeffery Gabbert, OASIS's former Director of Case Management, testified that AHF *had corrected* any documentation issues before May 1. ECF No. 68-6 at 113.

OASIS's proposed termination concerned DOH officials, who tried to mediate between the parties to keep AHF's contract in place. On May 2, Mr. Goodman told Mr. Moody that he was

---

[3] OASIS's contract with DOH requires that "[a]ny modifications, amendments or termination of any subcontract agreements must be submitted to the [Department of Health] for review and approval prior to execution." ECF No. 28-1 at 19. However, Mr. Moody and other DOH officials seemed to believe, incorrectly, that OASIS had a unilateral right to terminate its agreement with AHF without submitting any such termination to DOH for review. *See* ECF No. 68-19 (email from Mr. Moody to DOH colleagues stating, "apparently the language of the contract gives them the right to terminate, after giving a 30-day notice").

[4] Unlike AHF, CAN does not provide daily, in-person outpatient medical services, and relies significantly on "tele-health" technology to treat patients remotely. ECF Nos. 68-5 at 62-63; ECF No. 29 at 169-70. In contrast, AHF employed a mobile health vehicle that traveled to the remote sections of Area 1 to treat those patients unable to travel to Pensacola for services. ECF No. 29 at 14-15, 24, 28-29.

"willing to rescind the termination notice if AHF is amenable to abiding by the terms and conditions of the contract." ECF No. 68-20. That same day, Mr. Goodman wrote a letter to Jennifer Hill at the DOH stating that he would not terminate AHF's contract if AHF confirmed "in writing" that it would agree to the terms of the contract.  ECF No. 28-23.  But this letter was not sent to AHF – which in any case had confirmed its adherence to the contract in writing the week before. ECF No. 68-15.

DOH officials attempted to set up a meeting between AHF and OASIS on May 8.  ECF No. 68-21.  But by that time, OASIS had already signed and transmitted a contract with CAN for both case-management services and ambulatory medical services.  ECF No. 68-22 at 2.

In May 2023 – before the contract was terminated – AHF's case managers all had fewer than 100 clients and were in compliance with the contract terms.  *See* ECF Nos. 68-23; 28-20 at 6. OASIS recognized this in their own analysis of AHF's files.  ECF No. 68-18.

OASIS's decision to terminate the entirety of the agreement—terminating not only AHF's case-management services but also its outpatient medical care program—seriously disrupted the continuity of care for AHF's low-income patients living with HIV/AIDS, and the therapeutic relationships that foster adherence to medications and the medical plan of care.  ECF Nos. 28-6; 29 at 12-20; 67-70; 28-20 at 7-8.  Even before the contract with AHF ended, OASIS began contacting AHF's outpatient clients and ordering them to switch their medical care to CAN; this included AHF clients with private insurance who did not depend on Ryan White funds for medical care, and thus were not within the ambit of the subcontract (and should not have been contacted by OASIS in the first place).  ECF No. 29 at 67-70.  OASIS's conduct left longtime AHF patients – some of whom had been with AHF 10 to 15 years – "tearful" and "scared" and uncertain of

where or how they would receive their medical care.  *Id.* at 69.  OASIS's actions risked causing some patients to discontinue their care altogether.  *Id.*

After terminating the contract with AHF in favor of CAN, OASIS began having problems with CAN's services almost immediately.  On July 19, 2023, Mr. Goodman had to email CAN officials about the lack of documentation in CAN's client files – the same issue that ostensibly led to AHF's termination.  ECF No. 68-24.  Beyond that, CAN's caseloads fell *below* 60 clients per case manager, which not only violated CAN's contract with AHF, but also caused OASIS to breach its contract with DOH, which required all case managers (including subcontractors) to maintain a minimum of 60 clients per case manager.  ECF Nos. 68-26; 68-22; 28-1 at 16; 68-1 at 71-73.  Yet OASIS did not terminate CAN's contract based on this contract violation, nor did it impose any financial penalties as contemplated in their contract.  ECF No. 68-1 at 71-75.

Since the contract was terminated, AHF has continued to maintain its case managers to provide services to AHF clients at its own expense.  ECF Nos. 29 at 69-70; 68-2 at 26-28; 68-3 at 116; 68-14.

## **PROCEDURAL POSTURE**

On May 31, 2023, AHF filed this action asserting claims for breach of contract, breach of the covenant of good faith and fair dealing and tortious interference, and seeking damages and injunctive relief – specifically, an injunction to prevent OASIS from terminating their contract on June 1.  ECF No. 1.  AHF subsequently filed an Emergency Motion for Preliminary Injunction.  ECF No. 8.  OASIS opposed the Motion for Preliminary Injunction and filed a Motion to Dismiss the Complaint.  ECF Nos. 20 & 23.

On July 13, 2023, the Court held an evidentiary hearing on AHF's Emergency Motion for Preliminary Injunction.  *See* ECF No. 29.  Following the hearing, the Court asked for supplemental briefing from the Parties.  *See* ECF Nos. 35 & 36.

On October 10, 2023, entered an Order denying AHF's Emergency Motion for Preliminary Injunction [ECF No. 46] and an Order denying in part and granting in part OASIS's Motion to Dismiss [ECF No. 47].

In its order on the preliminary injunction, the Court found that, because the Ryan White program is a federal grant program, AHF's contract with OASIS is governed by federal regulations addressing federal grants.  ECF No. 46 at 13-21.  Specifically, the Court found that 2 C.F.R. §§ 200.319(b)(1) and (7) and 45 C.F.R. §§ 275.328(a)(1) and (7) apply to the Parties' contract.  *Id.* at 20-21.  Under 2 C.F.R. § 200.319(b)(1) and 45 C.F.R. § 75.328(a)(1), OASIS is prohibited from "placing unreasonable requirements on firms in order to qualify to do business"; and under 2 C.F.R. § 200.319(b)(7) and 45 C.F.R. § 75.328(a)(7), OASIS is prohibited taking "[a]ny arbitrary action in the procurement process."  *Id.* at 12.

In denying OASIS's motion to dismiss AHF's claims for breach of contract and breach of the covenant of good faith and fair dealing, the Court again confirmed that "federal regulations apply to the 2023 Agreement," and OASIS's violations of those federal regulations may form the basis of AHF's claims.  ECF No. 47 at 7-9.

## **STANDARD OF REVIEW**

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' if it might affect the outcome of the case under the governing law, and it is 'genuine' if the record taken as a whole could lead a rational fact finder to find for

the non-moving party." *Merritt v. Escambia Cnty., Fla.*, 3:15-CV-286/MCR/EMT, 2017 WL 1147462, at *2 (N.D. Fla. Mar. 25, 2017) (internal citations omitted). At summary judgment, "the Court views the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." *Fenwick v. LFG Techs. Inc.*, 3:14CV648/MCR/CJK, 2016 WL 7799622, at *1 (N.D. Fla. Feb. 1, 2016) (quoting *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008)). "Summary judgment is not appropriate 'if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts and if that inference introduces a genuine issue of material fact.'" *Merritt*, 2017 WL 1147462 at *2.

Applying these standards, Defendant's Motion for Summary Judgment [ECF No. 65] should be denied.

## **ARGUMENT**

### I.     **OASIS Is Not Entitled to Summary Judgment on Count I of the Complaint**

In Count I of the Complaint, AHF alleges that OASIS breached the Parties' contract by "arbitrarily and capriciously terminating its contract with AHF" based on the "new and arbitrary" caseload caps, contrary to the terms of the contract. ECF No. 1 ¶ 38. As the Court held in its Order denying OASIS's Motion to Dismiss this claim, the federal regulations governing federal grants and procurement are incorporated as terms of the Parties' agreement. *See* ECF No. 47 at 7. *See also Nat'l Distrib. Co., Inc. v. James B. Beam Distilling Co.*, 845 F.2d 307, 309 (11th Cir. 1988) ("the laws in force at the time of the making of a contract enter into and form a part of the contract as if they were expressly incorporated into it") (quoting *Fla. Beverage Corp. v. Div. of Alcoholic Beverages & Tobacco, Dep't of Bus. Reg.*, 503 So. 2d 396, 398 (Fla. 1st DCA 1987)); *Siemens Power Transmission & Distrib., Inc. v. Norfolk S. Ry. Co.*, 420 F.3d 1243, 1251 (11th Cir. 2005) (incorporating existing federal regulations into parties' contract). These include 2 C.F.R. §

200.319(b)(1) and 45 C.F.R. § 75.328(a)(1), which prohibit OASIS from "placing unreasonable requirements on firms in order to qualify to do business"; and 2 C.F.R. § 200.319(b)(7) and 45 C.F.R. § 75.328(a)(7), which prohibit OASIS from taking "[a]ny arbitrary action in the procurement process."  ECF No. 47 at 7.

In its Motion, OASIS asserts that its application of the 100-client caseload cap was not arbitrary.  ECF No. 65 at 14-15.  Indeed, OASIS necessarily argues that this is an *undisputed fact*. *Id.*  To the contrary, the record amply demonstrates that OASIS's caseload cap is arbitrary, and OASIS applied it in an arbitrary and unreasonable manner – and, moreover, that OASIS's reliance on the caseload cap as a basis to terminate the contract with AHF was pretextual.

The only evidence cited by OASIS in its Motion is the "needs assessment" prepared in 2017 recommending that caseloads be limited to less than 100 clients per case manager.  ECF No. 65 at 14-15 (citing ECF No. 64-1 at 3-4, 8-65).  But this "needs assessment" contains no *data* to support the contention that caseloads must be limited to 100 clients to maintain the standard of care for clients; indeed, there is no evidence that any other government agency (or lead agency such as OASIS) anywhere in the U.S. limits caseloads in this way, and Stidham testified that no such limits are imposed in any of AHF's 55 other Ryan White contracts. ECF No. 68-3 at 73-75. The absence of any empirical evidence to support the fundamental rationale of this caseload cap – the assumption that patient care necessarily suffers if case managers carry caseloads over 100 clients – by itself creates a genuine fact issue as to whether this caseload cap is arbitrary.

Notably, when Sacred Heart's caseloads exceeded 100 clients per case manager, OASIS took no action against that agency.  ECF Nos. 68-25; 68-1 at 88-90. Nor did OASIS seek to terminate the contract of CAN, its hand-selected predecessor to AHF, after CAN violated the caseload requirements of its contract and further caused OASIS to breach its contract with the

DOH.  ECF Nos. 68-26; 68-22; 28-1 at 16; 68-1 at 71-75.  And the undisputed evidence confirms that AHF was *in compliance* with the contract terms before OASIS terminated the agreement on June 1, and OASIS terminated the contract regardless.  ECF Nos. 68-23; 28-20 at 6; 68-18.  This disparate treatment of similarly situated contractors – sparing the rod for Sacred Heart and CAN, but not for AHF – is further evidence that OASIS's reliance on the caseload cap was arbitrary and unreasonable, in violation of both the federal regulations and the Parties' contract.

Moreover, the evidence shows that OASIS invoked the caseload cap as a pretext, and that Mr. Goodman in fact sought to terminate the contract *even before it was executed*, based on his personal grievances with AHF's staff.  Indeed, in a declaration supporting OASIS's opposition to a preliminary injunction, Mr. Goodman cited AHF's purported "hostility" as a basis for terminating the contract, ECF No. 28-19 at 6, and at the preliminary injunction hearing he complained that AHF's staff had "called me names" and "gone to the State over my head numerous times." ECF No. 29 at 152.

The evidence further shows that, before sending the termination notice to AHF, Mr. Goodman discussed with CAN his plan to terminate AHF's contract (for both case-management *and* outpatient medical services) and replace AHF with CAN, even though CAN had no case managers in Area 1 at the time, and it was providing virtually no medical services and it lacked the staff to provide full in-person outpatient services as AHF did.  ECF Nos. 68-4 at 23-27; 68-5 at 54.  This resulted in client documentation issues (ironically, the same issue OASIS cited in terminating AHF's contract), even though CAN could not maintain even the *minimum* caseloads required by OASIS and the DOH.  ECF Nos. 68-24; 68-26; 68-22; 28-1 at 16; 68-1 at 71-75.

OASIS's punitive termination of the medical services portion of the contract based on AHF's purported violation of the case-management portion of the contract was itself arbitrary and

unreasonable.  The undisputed evidence shows that the medical services provided by AHF were excellent – as Mr. Goodman himself admitted – and there are no allegations that AHF violated any terms of that portion of the contract. ECF No. 29 at 167-69.  Nevertheless, OASIS terminated AHF's outpatient medical services contract and replaced AHF with CAN, even though CAN provided virtually no Ryan White medical services at the time, and its capacity to provide such treatment was demonstrably inferior to AHF's, requiring CAN to rely on tele-health video conferences rather than the in-person treatment that AHF always provided.  ECF Nos. 68-5 at 54, 62-63; 29 at 169-70.

It is well established that the question of whether a party acted arbitrarily or unreasonably presents a triable issue of fact that generally cannot be resolved at summary judgment.  *See, e.g., Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co.*, 483 F.3d 1265, 1273 (11th Cir. 2011) (whether, and to what extent, party acted "reasonably and in good faith" constituted outstanding issue of fact that precluded summary judgment); *Adams v. Florida Dept. of Law Enforcement*, 96-113-CIV-T-17C, 1997 WL 158310, at *5 (M.D. Fla. Mar. 17, 1997)(same); *Reserve, Ltd. v. Town of Longboat Key*, 933 F. Supp. 1040, 1045 n.11 (M.D. Fla. 1996) (denying summary judgment where record contained factual issues as to whether defendant's actions were a "pretext for some arbitrary and capricious motivation").  Here, the evidence shows that OASIS singled out AHF and terminated its contract based (ostensibly) on a caseload cap that is not grounded on any empirical data, and that it did not enforce against another subcontractor that exceeded the same caseload limit.  The evidence further shows that when AHF's successor, CAN, committed even more serious violations – violating the caseload minimums required not only by OASIS but by the DOH – OASIS took no action against that provider.  There is also evidence from which a factfinder could reasonably conclude that OASIS relied on the caseload limit pretextually, based on Mr.

Goodman's personal grievances with AHF's staff and his desire to steer the contract to CAN, despite its inadequate ability to perform.

The record plainly shows that there are genuine and material factual issues regarding OASIS's implementation and enforcement of the caseload limit and its resulting termination of AHF, and whether OASIS's conduct was arbitrary and unreasonable, and thus violated 2 C.F.R. § 200.319(b)(1), 45 C.F.R. § 75.328(a)(1), 2 C.F.R. § 200.319(b)(7) and 45 C.F.R. § 75.328(a)(7), as incorporated in the Parties' contract.

Next, OASIS argues that AHF cannot demonstrate that it suffered any damages as a result of OASIS's breach of the contract. ECF No. 65 at 15-16. This, again, is incorrect. For instance, the evidence shows that AHF hired an additional case manager at its own expense based on Mr. Goodman's representation that he would not terminate the contract if AHF reduced its caseload to less than 100 clients per case manager (including the new case manager). *See* ECF No. 28-18 ("I agreed not to take any further action to allow you time to hire a part-time person as long as you were not continuing to add to the caseload"). This was established by the testimony and exhibits presented at the July 2023 preliminary injunction hearing, as the Court confirmed.[5] ECF No. 46 at 5. AHF also continued to bear the cost of its case managers after termination. ECF Nos. 68-14; 68-2 at 26-28; 68-3 at 116. "When a party produces evidence that it suffered damages, questions regarding the reasonableness and quantification of the damages are generally issues of fact." *Transformations Int'l Inc. v. Ohio Sec. Ins. Co.*, 6:20-CV-2296-ACC-LRH, 2022 WL 1619400, at *8 (M.D. Fla. Jan. 26, 2022) (internal citation omitted). Summary judgment is not warranted on this basis.

---

[5] At the injunction hearing, Ms. Averill testified that the new case manager was hired before June 1, 2023. ECF No. 29 at 65. AHF records show he was hired on May 30, 2023. ECF No. 68-27.

Defendant is also wrong on the law.  As the Eleventh Circuit has recognized, Florida law "require[s] an award of at least nominal damages if a breach of contract has been established." *Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1418 (11th Cir. 2011).  "It is a fundamental principle of contract law that once liability for a contract breach is established, an injured party is entitled as a matter of right to compensatory damages." *MSM Golf, L.L.C. v. Newgent*, 853 So. 2d 1086, 1087 (Fla. 5th DCA 2003).  Thus, "[o]nce a breach is established, the jury may award Plaintiff nominal damages even if Plaintiffs fails to quantify the extent of the loss," and therefore "summary judgment is not warranted." *Transformations Int'l*, 2022 WL 1619400 at *8 (internal citation omitted).  *See also Cardinal Point, LLC v. Edgewood Partners Ins. Ctr., Inc.*, 22-23170-CIV, 2023 WL 8543716, at *12-13 (S.D. Fla. Dec. 11, 2023) (denying summary judgment on breach of contract claim based on potential claim for nominal damages); *Kona Spring Water Distrib., Ltd. v. World Triathlon Corp.*, 8:05CV119 T23TBM, 2007 WL 842969, at *2 (M.D. Fla. Mar. 19, 2007) ("the possibility of an award of nominal damages precludes summary judgment"). For this additional reason, summary judgment should be denied.[6]

---

[6] OASIS further complains that AHF should have amended its initial disclosures to further address damages and asks this Court to strike AHF's damages evidence as a sanction.  ECF No. 65 at 16-17.  However, where, as here, sanctions under Fed. R. Civ. P. 37 would be dispositive of a claim, they may only be imposed "if the noncompliance involved willfulness, fault, or bad faith." *Go Mobile Flooring, LLC v. Blue Banyan Solutions, Inc.*, 663 F.Supp.3d 1294, 1305 (M.D. Fla. 2023) (citing *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1048-49 (11th Cir. 1994)).  Here, OASIS does not even argue that AHF acted in bad faith or that it willfully refused to amend its disclosures – and there is certainly no evidence of willful or bad faith conduct here.  Moreover, OASIS does not argue that it has suffered any prejudice, and it cannot credibly claim surprise – it has been on notice of AHF's hiring of an additional case manager, for instance, since at least July 2023.  *See, e.g.,* ECF No. 28-20 (ECF No. 24-1) at 6.  OASIS's motion for sanctions is without merit and should be rejected.

## II.      OASIS Is Not Entitled to Summary Judgment on Count II

OASIS's motion for summary judgment on Count II of the Complaint, AHF's claim for breach of the covenant of good faith and fair dealing, fails for the same reasons discussed above.

"Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005) (internal citation omitted).   A contracting party breaches its duty of good faith and fair dealing when its conduct "unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.*, 532 F.Supp.2d 1350, 1359 (M.D. Fla. 2007).   Florida law implies the covenant of good faith and fair dealing "even where the contractual obligation is one subject to the 'sole discretion' of one of the parties." *Penton v. Centennial Bank*, 4:18-CV-00450-AW-CAS, 2019 WL 6769661, at *4 (N.D. Fla. Nov. 22, 2019) (quoting *Dep't. of Revenue v. Gen. Motors LLC*, 104 So. 3d 1191, 1198 (Fla. 1st DCA 2012)).   Thus, "even if the terms of the contract afford [the defendant] substantial discretion to promote its self-interest, the duty to act in good faith nevertheless limits [the defendant's] ability to act capriciously to contravene the reasonable contractual expectations of the other party." *Id.* (*quoting Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097-98 (Fla. 1st DCA 1999)).

There is ample evidence to support AHF's claim for breach of the duty of good faith and fair dealing.   The evidence shows that OASIS's executive director, Mr. Goodman, was planning to terminate the contract before it was even *presented* to AHF, and he declared AHF to be in breach within 24 hours of receiving an executed copy of the agreement – providing AHF with no

reasonable opportunity to perform under the contract before providing the notice of termination on May 1.  ECF Nos. 29 at 126-27; 68-12; 28-16.  The evidence further shows that OASIS intentionally terminated AHF's contract to capture AHF's clients for itself and for CAN, its favored vendor.  *See* ECF Nos. 29 at 58; 68-1 at 19-24, 192-94.  Surely one cannot "follow standards of good faith and fair dealing" by entering into a contract with the express intent to immediately terminate it. *Centurion*, 420 F.3d at 1151.

Moreover, Mr. Goodman refused to impose the less severe financial penalties for any violations of the caseload cap even on a short-term basis to allow AHF to come into compliance with a contract term that had only just taken effect.  In reliance on Mr. Goodman's representations, AHF hired an additional case manager at its own expense to reduce the caseloads of its other case managers, with the expectation that in the interim it would pay any applicable financial penalties pursuant to the contract.  ECF No. 28-17.  Despite his prior representations to AHF, Mr. Goodman reversed course and instead terminated the contract.  ECF No. 28-4. Thus, OASIS effectively erased the "financial consequences" provision from the contract by fiat.  This was contrary to AHF's reasonable expectations; indeed, Dawn Averill of AHF testified that AHF expected that any violations of the caseload cap would be addressed through the financial penalties provision of the contract, as that is what the contract expressly contemplated.  ECF Nos. 28-17; 28-18; 29 at 60-61.  "[O]ne party cannot capriciously exercise discretion accorded it under a contract so as to thwart the contracting parties' reasonable expectations." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291 (11th Cir. 2001).  That is exactly what OASIS did here.

At a minimum, the record evidence demonstrates a genuine factual dispute as to whether OASIS acted in good faith under the parties' contract.  OASIS's motion for summary judgment on Count II should be denied.

### III.  OASIS Is Not Entitled to Summary Judgment on Count III

OASIS's motion for summary judgment on Count III, AHF's tortious interference claim also fails.

In this claim, AHF asserts that OASIS tortiously interfered with its relationships with its clients who received Ryan White services through AHF.  ECF No. 1 ¶¶ 47-54.  The evidence shows that OASIS improperly ordered AHF clients – including clients who were not utilizing Ryan White services – to terminate their relationship with AHF. ECF No. 29 at 67-70.  The facts support AHF's tortious interference claim.

As with its failed motion to dismiss [ECF No. 20], OASIS's motion rests on a single argument: its contention that, as the Area 1 lead agency, it had a privilege to interfere with AHF's client relationships.  This argument fails once again.

As a threshold matter, the privilege to interfere is an *affirmative defense*, and therefore OASIS "bears the burden of avoiding liability by showing that its conduct was privileged or justified." *Law Offices of David J. Stern, P.A. v. SCOR Reinsurance Corp.*, 354 F.Supp.2d 1338, 1346 (S.D. Fla. 2005).  And "[t]he question of whether certain conduct is privileged, however, is a factual question to be determined by a jury." *Id.*

The only record evidence OASIS cites in support of its Motion is its nominal "relationship" with AHF's clients arising from its role as lead agency in Area 1.  *See* ECF No. 65 at 21.  This solitary fact is hardly sufficient to establish that its conduct was privileged or justified, nor does this establish an absence of a dispute of material fact as to this issue, as required for summary judgment to be granted on this claim.  *See Blue-Grace Logistics LLC v. Fahey*, 653 F.Supp.3d 1172, 1185 (M.D. Fla. 2023).  For this reason alone, OASIS's motion should be denied.

Moreover, as the Court has recognized, the "privilege of interference" does not apply when the interfering defendant "acts 'out of malice alone, or solely for ulterior purposes' or employs improper methods, such as 'threats, intimidation and conspiratorial conduct,' 'the purposeful causing of a breach of contract,' or misrepresentations." ECF No. 47 at 9-10 (quoting *M & M Realty Partners at Hagen Ranch, LLC v. Mazzoni*, 982 F.3d 1333, 1339-40 (11th Cir. 2020)). There is evidence to support each of these elements here.

Mr. Goodman's animus toward AHF is patent: In his testimony at the injunction hearing, he complained (incorrectly) that AHF officials had "called me names" and "gone to the State over my head numerous times about all kinds of issues." ECF No. 29 at 152.  Elsewhere he accused AHF of being "petulant." ECF No. 28-15 at 2.  As a result of Mr. Goodman's ill will toward AHF, OASIS terminated both the case management *and* the outpatient medical services portion of the contract, though AHF did not violate that portion of its contract and its medical services were unblemished and superior to those of its replacement, CAN.  ECF Nos. 29 at 167-70; 68-5 at 54, 62-63.

The evidence further shows that OASIS manufactured the caseload cap as a pretext to terminate AHF's contract to give the contract to CAN, with whom OASIS had a beneficial financial relationship. ECF Nos. 68-1 at 45-47, 19-24, 192-94; 68-9; 68-10; 68-11; 68-4 at 22-27. This is further evidenced by the fact that OASIS did not enforce the caseload cap against its other provider, Sacred Heart, when it also exceeded the cap.  ECF Nos. 68-25; 68-1 at 88-90.

And there is evidence that OASIS relied on misrepresentations and improper methods in terminating the contract: Though Mr. Goodman repeatedly stated to AHF (and to the DOH) that OASIS had embarked on a lengthy "audit" which allegedly found a series of problems with AHF's documentation of client records that were never corrected, there is *no evidence* to support these

assertions.  To the contrary, Mr. Goodman specifically instructed his staff to find eight purported "examples" of documentation problems that he could cite in his April 19 letter threatening termination, *see, e.g.*, ECF No. 68-1 at 154 ("Q. Why eight? A. I don't know. It's just a number that was in my head"), and OASIS repeatedly refused to provide any identifying information or supporting documentation to back up these claims – either directly to AHF or in discovery in this action.  ECF Nos. 68-12; 68-15; 29 at 119-20; 68-3 at 79.  And, contrary to Mr. Goodman's claims, whatever documentation issues OASIS did identify were in fact corrected almost immediately – and before OASIS sent its May 1 termination notice.  ECF No. 68-6 at 113.   In short, OASIS relied on a trumped-up claim of documentation problems (which they have not proved up to this day) as a pretext to terminate the contract.  On this record, summary judgment is improper.  *See KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004) ("even where the defendant's motive is not purely malicious, a tortious interference claim may succeed if improper methods were used").[7]

As the Eleventh Circuit has recognized, whether a defendant "has gone beyond its limited and qualified privilege is generally a question for the trier of fact." *Id.* at 1325.  *See also Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1159 (11th Cir. 2001) (whether a party's means of interference is "improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question").  Accordingly, summary judgment on Count III is inappropriate.

## **CONCLUSION**

For the reasons stated herein, OASIS's motion for summary judgment should be denied.

---

[7] To the extent that OASIS argues that AHF has not presented evidence of damages for this claim, *see* ECF No. 65 at 22-23, this argument fails for the reasons stated above.  *See supra* at 19-20.

Dated: <u>May 3, 2024</u>.

Respectfully submitted,

By:    <u>*/s/ Scott Hiaasen*        </u>
          **Scott A. Hiaasen, Esq.**
          Florida Bar No. 103318
          **Kendall B.  Coffey, Esq.**
          Florida Bar No.  259861
          **Jeffrey B. Crockett, Esq.**
          Florida Bar No. 347401
          **Sergio E. Molina, Esq.**
          Florida Bar No. 1031693
          kcoffey@coffeyburlington.com
          shiaasen@coffeyburlington.com
          jcrockett@coffeyburlington.com
          smolina@coffeyburlington.com
          lperez@coffeyburlington.com
          bdiaz@coffeyburlington.com
          service@coffeyburlington.com
          **COFFEY BURLINGTON, P.L.**
          2601 South Bayshore Drive, Penthouse One
          Miami, Florida  33133
          Telephone: (305) 858-2900
          Facsimile:  (305) 858-5261

          *Counsel for Plaintiff AIDS Healthcare*
          *Foundation, Inc.*

<u>**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 56.1(E)**</u>

    I hereby certify that this Response and Memorandum of Law contains 7,955 countable words according to the word-count function of the word-processing system used to prepare them.

          <u>     */s/ Scott Hiaasen*       </u>
          Scott Hiaasen

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 3, 2024, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by CM/ECF and served on all counsel of record and all others registered to receive electronic service of court documents in this case via transmission of the Notice of Electronic Filing generated by CM/ECF.

*/s/ Scott Hiaasen*
Scott Hiaasen

| | |
|---|---|
| **SERVICE LIST** *AIDS Healthcare Foundation, Inc. v. OASIS, et al.* **Case No. 4:23-cv-00230-MW/MAF** | |
| **Douglas Alan Bates, Esq.**<br>**Daniel E. Harrell, Esq.**<br>dbates@clarkpartington.com<br>dharrell@clarkpartington.com<br>ahallecy@clarkpartington.com<br>jknudsen@clarkpartington.com<br>ldunlap@clarkpartington.com<br>jdallman@cphlaw.com<br>pmimperial@clarkpartington.com<br>**CLARK PARTINGTON**<br>P.O. Box 13010<br>Pensacola, Florida 32591-3010<br>Telephone: (850) 434-9200<br>Facsimile: (850) 432-7340<br><br>**Bailey Howard, Esq.**<br>bhoward@clarkpartington.com<br>**CLARK PARTINGTON**<br>215 S. Monroe Street, Suite 530<br>Tallahassee, Florida 32301<br>Telephone: (850) 320-6831<br>Facsimile: (850) 597-7591<br><br>*Counsel for Defendant Okaloosa AIDS Support and Informational Services, Inc. a/k/a "OASIS"* | |